Coe **KANE**, Appellant,

v.

**UNITED STATES of America,**
**Appellee.**

No. 22168.

United States Court of Appeals
Ninth Circuit.

Aug. 19, 1968.

Certiorari Denied Jan. 20, 1969.

See 89 S.Ct. 698.

Robert J. Hirsh (argued), Tucson, Ariz., for appellant.

Jo Ann D. Diamos (argued), Asst. U. S. Atty., Edward E. Davis, U. S. Atty., Tucson, Ariz., for appellee.

Before HAMLEY and DUNIWAY, Circuit Judges, and TAYLOR,* District Judge.

HAMLEY, Circuit Judge:

On November 26, 1966, Coe Kane, an enrolled member of the White Mountain Apache Tribe of Indians, shot and killed his wife, an enrolled member of the Hualapai Tribe of Indians, at their residence within the Fort Apache Indian Reservation at Canyon Day, Arizona. He was indicted and tried before a jury in the United States District Court for the District of Arizona on a charge of murder committed by an Indian within Indian country (18 U.S.C. §§ 1111, 1151 and 1153 (1964)).[1]

The jury found Kane guilty of the included crime of voluntary manslaughter. See 18 U.S.C. § 1112(a) (1964). He was sentenced to imprisonment for ten years with the provision that he may be eligible for parole at the discretion of the board of parole pursuant to 18 U.S.C. § 4208(a) (2) (1964). Kane then took this appeal.

Kane's principal defenses at the trial were insanity arising from a chronic undifferentiated schizophrenic disorder, and temporary insanity by reason of pathological intoxication.[2] At the close of the trial counsel for Kane, proceeding under Rule 29, Federal Rules of Criminal Procedure, moved for judgment of acquittal. He did so on the ground that, under the evidence, Kane established the defense of insanity as a matter of law. Kane here argues that the trial court erred in denying this motion.

---

* The Honorable Fred M. Taylor, United States District Judge for the District of Idaho, sitting by designation.

1. The only statute referred to in the indictment is 18 U.S.C. § 1152 (1964), which is not applicable. The judgment, however, refers to the basic statute as 18 U.S.C. § 1153, and Kane makes no point of the variance. 18 U.S.C. § 1111, defines the crime of murder within the special maritime and territorial jurisdiction of the United States. 18 U.S.C. § 1151, defines the term "Indian country."

2. While Kane did not advance a defense based on voluntary intoxication unassociated with any pathological condition, an instruction thereon was given at the request of the Government. This instruction was to the effect that if Kane was intoxicated at the time of the shooting the jury might take that into consideration in determining whether Kane had the specific intent requisite to establish first degree murder.

Except for minor discrepancies, the relevant evidence is undisputed. Kane had suffered three head injuries prior to the shooting on November 26, 1966. In 1954 he sustained a skull fracture and was unconscious for a couple of months. In 1960 he was hospitalized with a head injury. In May or June of 1966 Kane was knocked temporarily unconscious in a collision with a steer.

Following his 1960 injury, Kane began to experience an unusual reaction to alcohol. He testified that, following this injury he would lose consciousness after six or seven beers. After the most recent injury in 1966, however, the blackout periods became more frequent. Apparently this was caused by a further decreased tolerance to alcohol. Kane made it clear in his testimony that he was aware that consumption of alcohol was causing the loss of consciousness.

In the early afternoon of the day the shooting occurred, Kane had shared three half-gallon pitchers of beer with an old friend, Eddy Edwards, at Pinky's Tavern, near Globe, Arizona. Kane testified that when he began drinking he had no intention of injuring anyone. He also testified that midway through the second pitcher he blacked out and does not remember anything until later in the afternoon when he found himself walking to a house with two strangers to obtain oil for his car.

The two strangers were Louis and Jimmy Luttrell, hitchhikers Kane had picked up about 4:00 or 5:00 p. m. on that day while Kane was driving to his house at Canyon Day. The Luttrells testified that during the three and one-half hour journey Kane drove quite fast and sometimes went over the double line. During this drive the oil gauge warning light on the vehicle went on. Kane stopped the car and the three of them walked a mile or two to where Kane obtained oil from a friend, after which they returned to the car and resumed the drive.

At a point about a twenty-five minute drive from Kane's home, he stopped again at a service station for more oil. At this station Kane purchased a six-pack of beer stubbies and drank two of these during the remainder of the drive to his home. The Luttrells each drank one stubby. Kane told the Luttrells that they could sleep in his car that night at his home and the next morning he would take them to a place where they could catch another ride on their way to U. S. Highway 66.

Kane's wife, Ethel, was apparently afraid to have the hitchhikers around the home. After she and her husband invited them inside, Ethel picked up the Kanes' baby and went into the bedroom. Kane went into the bedroom with her and came out with a gun.[3]

Ethel came out of the bedroom, picked up the two remaining stubbies of beer and started out the front door. Up to this time Kane did not appear to be angry and had not raised his voice. However, when Ethel started out the door with the beer, Kane did raise his voice, and said, "Where are you going?" She replied, "I'll be back." He said, "Where are you going with my beer? Come back or I'll shoot you."

She turned around, walked towards him and said, "You wouldn't." Kane picked up a heavy rifle but threw it back down. Then he picked up another rifle, levered and aimed it, and shot his wife in the side of the head.

Kane testifed that after finding himself walking up a road with the two hitchhikers, to obtain oil, he was conscious for only a brief period before again blacking out after drinking the stubbies of beer in his car. According to Kane, he did not recover from this second blackout until he arrived home. He testified that he remembers his wife

---

3. Either just before she went into the bedroom or when the Luttrells entered the house, Ethel remarked to them: "I don't like to be around him when he's drinking." At this time Louis Luttrell thought that Kane appeared "half intoxicated," and Jimmy Luttrell believed him to be "drunk."

was concerned about the hitchhikers. He stated that he remembers going into the bedroom with her and then coming out with a gun. The next thing he remembers, Kane testified, is that his wife was lying dead on the floor. He stated that he remembers sending his daughter for help, but does not remember anything after that until sometime after his arrest.

A few minutes after Kane shot his wife, three neighbors came to the house to investigate the shooting. They found Ethel bleeding on the floor with Kane crying over her.[4] One of these men testified that he did not smell alcohol on Kane's breath, nor did he believe that Kane's eyes appeared glassy. However, another stated that he thought that Kane looked like he was in a state of shock. This witness testified that after Kane was placed in a police car he said, "What am I doing here?" A third witness testified, under cross-examination by the Government, that Kane was incoherent shortly after the police and neighbors arrived at the Kane residence.

Four qualified psychiatrists testified at the trial. Two of them, Dr. Hubert Estes and Dr. Marshall Jones, had been appointed by the trial court to examine Kane. The other two, Dr. Robert Cutts and Dr. Willard Shankel, were produced by Kane.

Dr. Shankel was the only expert to express the opinion that, at the time of the shooting (and at the time of the trial), Kane was suffering from a chronic and undifferentiated schizophrenic disorder.[5] He expressed the view that Kane was "psychotic," meaning "insane," at the time he shot his wife.

Dr. Shankel's opinion as to Kane's mental condition at the time of the shooting was not, however, disassociated from the factor of intoxication. He testified that Kane suffered hallucinations and delusions even when he was not drinking and in July of 1966 underwent an attack of delirium tremens as a result of excessive drinking. In addition, Dr. Shankel described Kane's condition when he shot his wife as a "dissociative episode," brought on by the stress of the moment plus the drinking.[6]

Dr. Shankel further testified that, in his opinion, Kane was, at the time in question, by reason of mental illness, unable to understand the nature of his acts and unable to distinguish right from wrong and to adhere to the right.

Dr. Shankel's testimony was sufficient to give application to the principle that where an accused produces substantial evidence tending to support the defense of insanity, the burden is then upon the Government to prove to the satisfaction of the jury beyond a reason-

---

4. Before these individuals entered the house, however, Kane had peered out a window at them and had motioned for them to enter through the front door.

5. Explaining what he meant, Dr. Shankel stated:

 "It means he is mentally ill, that this is a chronic, that is, a long-term process, that there are certain disorders of thinking and emotion and behavior which he exhibits, that there are periods, there seem to have been several periods in Mr. Kane's history in which he was psychotic, or to use the legal term, insane."

6. In further explanation of his view as to the effect on Kane of the consumption of alcohol, Dr. Shankel testified:

 "Most of us in this courtroom are familiar with the fact that with a few drinks under our belt our behavior does change, our perception of the environment changes, our control of our behavior is lessened. There are often quite dramatic personality changes associated with intoxication. The shy man may suddenly become the life of the party, the gentle fellow may become quite a brawler, and the faithful husband may wind up making a pass at somebody he has no business making a pass at. These are all things we can more or less accept because all control isn't left. My opinion of Mr. Kane is that his mental condition is such that under any sort of undue stress, such as drinking, he can lose all control, all knowledge of what he is doing, he can lose all ability to perceive the environment directly."

able doubt that he was sane at the time the act was committed. See Davis v. United States, 165 U.S. 373, 378, 17 S. St. 360, 41 L.Ed. 750; Buatte v. United States, 9 Cir., 330 F.2d 342, 344–345; Buatte v. United States, 9 Cir., 350 F.2d 389, 391. The trial court so instructed the jury.[7]

The testimony of the other three psychiatrists does not support Dr. Shankel's opinion as to the nature of Kane's mental illness but, in fact, rebuts it. They each expressed the view that Kane had a mental disease known as "pathological intoxication." They described pathological reaction to alcohol as a latent mental condition caused by head injuries or brain damage. This condition lowers the tolerance level to alcohol so that not only does intoxication occur more readily but the results of intoxication are far more drastic than would normally be the case. Among such drastic reactions which may result from consumption of a relatively small amount of alcohol are confusion, amnesia, loss of perception to reality, and violent conduct.[8]

Doctors Cutts, Estes and Jones each expressed the view that at the time of the shooting Kane was essentially unaware of what he was doing, did not know the nature and quality of his action, and was in an uncontrolled state. But none of them associated this opinion in any way with any mental disorder other than pathological intoxication.

The purport of their testimony was that Kane was sane only when he was sober. Dr. Cutts described him as "sane but vulnerable." Dr. Jones testified that he did not believe hallucinating was part of Kane's reaction to alcohol. Doctors Cutts and Estes did not mention any hallucinating by Kane and Dr. Estes testified that, in his opinion, Kane was not a paranoid schizophrenic.

■ In view of the testimony of Doctors Cutts, Estes and Jones, summarized above, we are convinced that, insofar as a schizophrenic disorder is concerned, the jury was entitled to find, beyond a reasonable doubt, that Kane was sane and therefore criminally responsible for shooting his wife.

Kane proceeded at the trial, and proceeds in this court, as if the testimony of Doctors Cutts, Estes and Jones, concerning so-called pathological intoxication, presents but another facet of an insanity defense. There is, perhaps, some superficial basis for such a view, inasmuch as all three of these doctors expressed the opinion, characteristic of the M'Naghten test, that at the time he shot his wife Kane did not know the nature and quality of his action and was in an uncontrollable state.

■ But this element of the M'Naghten test is not to be read independently of the M'Naghten concept that the mental condition which produced such disability must have been brought about by circumstances beyond the control of the actor.

■ According to these three doctors, Kane did not have this disability when

7. This court has consistently held that the insanity defense to be applied in this circuit is that which was formulated in M'Naghten's Case, 10 Cl. & F. 200, 210; 8 Eng.Rep. 718 (1843), as extended by the "irresistible impulse" theory. See Sauer v. United States, 9 Cir., 241 F.2d 640, 642, which was recently adhered to in Ramer v. United States, 9 Cir., 390 F.2d 564. All references to Kane's "sanity" or "insanity" in this opinion should be so understood.

8. It should be noted, however, that the testimony of these three experts concerning Kane's condition of pathological intoxication was far from categorical. As a matter of fact, when the three doctors were asked to pinpoint the effect of alcohol on Kane as opposed to the effect of alcohol on a normal person who drinks until he is blind drunk, their responses were inconclusive. Dr. Cutts testified that it was "impossible to state" what the difference would be. Dr. Estes stated that a person suffering from pathological intoxication "can" act differently than a normal drunk. Dr. Jones indicated that a person suffering from this condition "responds in a way not accounted for only by the alcohol." According to Dr. Jones, Kane's act of shooting his wife would not be his ordinary type of behavior whether drunk or sober.

he was sober. He had it only when he voluntarily began to drink.[9] It is true that, because of pathological intoxication, it took less liquor to produce unsocial results than with one not so afflicted, and the unsocial results were more serious than in the case of normal intoxication. But still, the disability which he does acquire from drinking liquor was within his own control and cannot be classified as a mental illness excusing criminal responsibility.

It therefore seems to us that if the expert opinions expressed by these three doctors provide a defense for Kane, it is not an insanity defense, in the usual sense, but rather it must be based upon some exception to the general rule that voluntary intoxication is not a defense.[10]

■■ The only exception to this general rule which presently enjoys judicial acceptance is the so-called "exculpatory" rule, under which drunkenness may be taken into account to show that a particular state of mind, or "specific intent," regarded as a necessary ingredient of some crimes, was not present.[11] In the case of prosecutions for murder under 18 U.S.C. § 1111, such as we have before us, the exculpatory rule, if found applicable under the facts, would protect Kane from a first degree murder conviction since such a conviction requires "specific intent." [12] The included crimes of murder in the second degree (18 U.S.C. § 1111) and voluntary manslaugh-

ter (18 U.S.C. § 1112), do not require a specific intent (willful, deliberate, malicious and premeditated), as distinguished from a general intent to kill, and therefore, as to them, the exculpatory rule is inapplicable. See Bishop v. United States, 71 App.D.C. 132, 107 F.2d 297. 302–303.

■ Since Kane was not convicted of first degree murder, but of voluntary manslaughter, he was not prejudiced by any possible error with respect to the application of the exculpatory rule, nor does the record indicate that there was any error in this regard.

In the American Law Institute's Proposed Official Draft of the Model Penal Code (May 4, 1962), section 2.08(4), entitled "Intoxication," an additional affirmative defense based upon intoxication is proposed. As there stated, intoxication which is "pathological," is an affirmative defense if by reason of such intoxication the actor at the time of his conduct "lacks substantial capacity either to appreciate its criminality [wrongfulness] or to conform his conduct to the requirements of the law." The term "pathological intoxication" is there defined as "intoxication grossly excessive in degree, given the amount of intoxicant, to which the actor does not know he is susceptible."

■ There is no present judicial recognition of an affirmative defense based on "pathological intoxication" as

9. There was no evidence that Kane was a chronic alcoholic in the sense that he could not prevent himself from drinking. And even if there had been such evidence it is problematical that it would excuse him from criminal responsibility under the present state of the law. See Powell v. Texas, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed. 1254, decided June 17, 1968.

10. We refer to this as the general rule because it is the settled view of the common law and is articulated in the statutes of some twenty states. See American Law Institute, Model Penal Code, Tentative Draft No. 9, May 8, 1959, Comments following Section 2.08. It is also the rule by judicial decision in the federal courts. See Tucker v. United States, 151

U.S. 164, 169, 14 S.Ct. 299, 38 L.Ed. 112; Heideman v. United States, 104 U.S.App. D.C. 128, 259 F.2d 943, 946.

11. This "specific intent" rationale has led to the statutory codification of the exculpatory rule in nineteen states. With the exception of Missouri and Vermont, the states having no statutory provision have reached a result substantially similar to the exculpatory rule by judicial decision. See Note, "Volitional Fault and the Intoxicated Criminal Offender," 36 Cinc.L.Rev. 258, 269–270 (1967). This rule is in effect in the federal courts. See Tucker v. United States, supra, at 169; Hopt v. People, 104 U.S. 631, 634, 26 L.Ed. 873.

12. The trial court so instructed the jury.

so defined, and we do not intend anything said in this opinion as an intimation that such a defense should be recognized. We need not reach that question because it was not raised in the trial court. Counsel for Kane did not ask for an instruction submitting such a defense, and no such instruction was given.

Moreover, one essential element of such a defense, as stated above, is that the actor "does not know he is susceptible" to intoxication "grossly excessive in degree, given the amount of the intoxicant. * * *" The clause "intoxication grossly excessive in degree, given the amount of the intoxicant" presumably comprehends not only the idea that a person so afflicted knows that he has a lower tolerance to alcohol than in the case of one not so afflicted, but that he knows that, once the tolerance level has been reached, the conduct induced thereby is usually more radical than would otherwise be the case.

 There is no evidence in this record that Kane did not know that he is susceptible to these two deleterious reactions from his voluntary consumption of liquor. Quite to the contrary, his testimony indicates that he was well aware of the fact that a modest amount of alcohol causes him to "black out," and to experience amnesia. Thus, even if Kane's counsel had asked the trial court to instruct the jury on such a defense, lack of supporting evidence would have warranted refusal.

All of the considerations discussed above lead us to conclude that the trial court did not err in denying the motion for judgment of acquittal.

Kane argues that the district court erred in several other respects. We have reviewed each of these arguments and conclude that none of them call for reversal. In order to record the fact that each of these questions has been adjudicated against Kane, we make the following brief reference thereto.

 In our opinion the trial court did not abuse its discretion in limiting the voir dire examination of jurors; did not err in receiving articles in evidence as against a claim of unreasonable search and seizure; and did not err in overruling an objection to a question concerning the present condition of the rifle.

 Nor did the trial court err in excluding the proffered testimony of a witness to the effect that, based on Kane's reputation for truth and veracity, the witness would believe him under oath; did not, in view of the instructions given, err in refusing to give Kane's requested instruction that it is assumed that a witness will speak the truth; and did not err in refusing to give Kane's requested instruction to the effect that specific intent is a necessary element of the crimes of murder (not delineated as to degree) and manslaughter.

 We are also of the opinion that the trial court did not err in excluding testimony to the effect that numerous arrests are made on the Apache Indian Reservation of persons living thereon, and that such fact does not affect their opinion as to a person's reputation. Finally, while it would have been preferable to exclude the testimony concerning an asserted statement by Mrs. Kane, in October, 1965, that she wanted to go home to live and allow Kane to live with another woman, we do not believe that the error, if any, was prejudicial.

Affirmed.