UNITED STATES of America,
Plaintiff-Appellee,

v.

Reno SOUNDINGSIDES,
Defendant-Appellant.

No. 86–1239.

United States Court of Appeals,
Tenth Circuit.

May 15, 1987.

Rehearing and Rehearing En Banc
Denied Aug. 17, 1987.*

* See 825 F.2d 1468.

Louis Edward Epps of Woodard & Epps (Rhonda Sigrist Woodard of Woodard & Epps, Cheyenne, Wyo., was also on brief), for defendant-appellant.

David A. Kern, Asst. U.S. Atty. (Richard Stacy, U.S. Atty., Cheyenne, Wyo., was also on brief), for plaintiff-appellee.

Before HOLLOWAY, Chief Judge, SEYMOUR, Circuit Judge, and SAFFELS, District Judge *.

HOLLOWAY, Chief Judge.

Defendant-appellant Reno Murray Soundingsides, also known as Robert Murray Willow, was convicted on a jury verdict of guilty of the second degree murder of a young Arapahoe Indian Woman, Valerie K. Quiver, on or about December 12, 1980, in violation of 18 U.S.C. §§ 1111 and 1153. Defendant appeals. We conclude that because of several items of prejudicial evidence improperly admitted, the conviction must be reversed and the case must be remanded for a new trial.

I

Viewed most favorably to the verdict as required, the evidence at trial showed that on December 11, 1980, Soundingsides, of Mixed Sioux-Arapahoe descent, was living with Valerie Quiver in a cabin adjacent to the Willow family residence about one quarter mile north of Elethe, Wyoming on the Wind River Indian Reservation. The Willow residence borders on a forty to sixty acre alfalfa field. On the east side of

the field is the residence of the Louella Goggles family. II R. 64–70, 86–87.

When found initially on December 12 by Officer Ridely, the patrolman who answered the initial call on the matter, and Frank Adakai, an investigator with the Bureau of Indian Affairs, Valerie was dead and her badly beaten body was lying on a bed inside the Soundingsides-Quiver cabin, wrapped in a green blanket. II R. 63–64, 87–90. Soundingsides told Ridely he found Valerie's body in the alfalfa field early that morning, brought her back to the cabin, and built a fire for her. He said he thought Willard Goggles might have beaten her up, but in fact Willard Goggles was at his father-in-law's house in Montana at the time and did not find out about Quiver's death until 3 months later. Ridely and Adakai both said at trial that they noticed bruises on Soundingsides' right hand and that Soundingsides smelled of alcohol. II R. 63–66, 99–102, 155–56. Adakai and the county coroner, who arrived later, took some photographs of the badly beaten body and the inside of the cabin. These photographs were later admitted in evidence without objection and the prosecution showed slides corresponding to the photographs on a screen for the jury. II R. 87–90, 93.

The next day, December 13, Adakai, Officer Ridely, and an F.B.I. agent canvassed the premises where Valerie's body lay and the field. They found sled tracks leading south to the Willow residence, several areas where blood was visible on the ground, and the victim's coat. There were signs of a struggle at one location in the field. The F.B.I. agent found a shoe in the field which matched the one on Valerie's foot. II R. 102–03, 106.

At trial Dr. John Harris, the pathologist who performed an autopsy on Valerie's body, showed the jury slides and photographs taken during the autopsy which, like the photos admitted in connection with Investigator Adakai's testimony, depicted

---

* The Honorable Dale E. Saffels of the United States District Court for the District of Kansas, sitting by designation.

the severe injuries to her body in graphic detail. II R. 127–29. In describing one photograph showing the position of Valerie's head as it was on her pillow in the cabin where her body was found, Dr. Harris pointed out that the head was "in a relatively flexed position." He said this was important for "understanding the scene" because "[t]he first thing you do with someone who's unconscious is extend the head so the airway isn't obstructed." II R. 131–32. He said the primary cause of death was blunt force injury to the head, although Valerie's condition had been aggravated by her high blood alcohol content and her exposure to the cold. II R. 141–42. He said the time of death was somewhere in the early morning hours of December 12.

Before he started his relationship with Valerie, Soundingsides had lived with Gloria Goggles. Gloria testified that she first met and started dating Soundingsides when she was fourteen or fifteen, and that during their two and a half to three year relationship Soundingsides slapped, hit and kicked her "[p]ractically everyday." II R. 172. This testimony is detailed below.

Gloria also testified that on the evening of December 11, 1980, she, Melvin Goggles, and some friends were sitting in the friends' pickup truck outside her home drinking beer when Valerie showed up alone. Gloria testified that Valerie was uninjured but appeared scared. Valerie jumped into the truck and locked the door. Shortly thereafter Soundingsides showed up, wanting to talk to Valerie. One of Gloria's friends unlocked the door to the truck and Soundingsides opened it. Valerie got out; she and Soundingsides went behind the truck and talked for about five minutes and then walked off together. II R. 174–178.

George Willow, Soundingsides' cousin, testified that on the afternoon of December 11 he and Soundingsides met at the Willow house and went into the alfalfa field to drink beer. Roger Brown was already in the field and the three of them drank for about an hour and a half. He said Valerie was not there. He and Soundingsides got into a fight, and after the fight he left to go home. Soundingsides and Brown were "pretty drunk," having had about twelve beers. He said Soundingsides was already drunk when he came to see Willow that evening. II R. 199–201, 203–04.

Kevin Jenkins is related to Valerie by marriage and at the time of trial was being detained in the Fremont County jail in Lander, Wyoming on burglary and assault charges. II R. 206, 216. He testified he and Ed Soundingsides, Reno's brother, escaped in 1982 from the Fort Washakie, Wyoming jail and that while hiding out he came in contact with Reno Soundingsides for about four days. II R. 207–09.

Jenkins denied on the stand that Reno mentioned anything about Valerie. II R. 209. However, the prosecuting attorney read a pretrial statement in which Jenkins admitted telling a police investigator on May 2, 1985 that Reno told him he wanted to "tag along" with Ed Soundingsides and Jenkins because the police were after him for the killing of Valerie Quiver. In the statement, Jenkins said Reno Soundingsides admitted killing Valerie but said he did not ask Soundingsides for details. II R. 210. On the stand, Jenkins denied making the statement, saying "it's not written down the same way, exact same way." II R. 211. Jenkins did, however, admit making a similar statement to Special Agent Mark Safarik of the Federal Bureau of Investigation. II R. 211–213.

The prosecution called Agent Safarik who met with Jenkins at the Fremont County Jail in April 1985, II R. 219–222, and prepared a written statement summarizing what Jenkins told him in the interview. II R. 223–24.

The trial judge admitted Agent Safarik's hand written account of Jenkins' statement for impeachment purposes over an objection that it was not signed or sworn and was not proper impeachment, and the prosecuting attorney read it to the jury. The statement says Jenkins told Agent Safarik that he escaped from the jail of the Fort Washakie Police Department and that he and Ed Soundingsides were on the run

from the police. He met up with Reno Soundingsides, and Reno told Jenkins that the police were after him for the murder of Valerie. Reno Soundingsides admitted to Jenkins he killed Valerie but told Jenkins he was not worried because the police had no evidence to pin the murder on him. Soundingsides told Jenkins he wanted to accompany Jenkins and Ed Soundingsides out of state to make a new start. II R. 225–227.

Roger Brown, then an inmate at the Federal Correctional Institute at El Reno, Oklahoma, testified that Soundingsides and Valerie "used to get into arguments and stuff" and that he saw Soundingsides "slap her in the field" in December of 1980. II R. 231. He said that at about 8 or 9:00 in the evening on December 11, 1980, he, Soundingsides, George Willow and Valerie got together at Brown's house, went into the alfalfa field, and drank for about forty minutes. While they were drinking, Soundingsides slapped Valerie, and a fight broke out between Soundingsides and Willow because Soundingsides accused Willow of being involved with Valerie. Brown testified that Soundingsides hurt his hand during this fight. Valerie left to get a match for a cigarette and Soundingsides, Willow and Brown went looking for her shortly afterward. They eventually found her at the Goggles' residence. II R. 232–235.

Roger Brown testified that he did not know what happened at the Goggles residence because he went home at that time. II R. 236. He admitted that he told the prosecuting attorney and two F.B.I. agents in an earlier interview while incarcerated at El Reno that he had seen Soundingsides and Valerie go behind the truck at the Goggles residence and saw Soundingsides beating Valerie in the alfalfa field after they left the Goggles residence the night of December 11. He admitted that his trial testimony that he did not see the events in the field was "the same story" he had told F.B.I. agents in 1980 and in an interview in February of 1985 while incarcerated at El Reno. Brown said he remembered taking a lie detector test after the February 1985

interview and that the agents told him the polygraph showed he was not telling the truth, but he said he did not understand it. He said he did not tell the truth in the latest interview because he was "alone" and "scared" in the penitentiary and had no lawyer. II R. 236–38.

The Government presented testimony by F.B.I. Agent William Brown, over a hearsay objection, that while Roger Brown was at El Reno he interviewed Brown on three occasions in 1985. In the first interview in February Roger Brown said he recalled drinking with Soundingsides but did not remember Soundingsides striking Valerie. In the second interview in March Roger Brown told the agent that Soundingsides "jerked" Valerie out of the truck, hit her, knocked her down, and kicked her a couple of times, all at the Goggles residence. Roger Brown did not know if Valerie was unconscious or dead, but she was still. Agent Brown testified Roger Brown told him he went home at this time. II R. 251–52.

In the third interview Roger Brown told Agent Brown the following, according to Agent Brown's testimony. On the evening of December 11, after Valerie left the others in the field to get a match for a cigarette, Soundingsides and George Willow got into a fight over her. At this point Willow left and Soundingsides asked Brown to accompany him to find Valerie. They eventually found her at the Goggles residence. Soundingsides went to the front of the house, and Brown to the back. Brown saw Soundingsides and Valerie walking away from the Goggles residence and went to join them. While the three of them were crossing the alfalfa field, Soundingsides and Valerie started arguing. Soundingsides knocked her to the ground, and, as Brown started walking away, he heard the sound of Valerie being kicked. Brown turned around and went back. Soundingsides had pulled Valerie's trousers down around her calves, and he invited Brown to have sex with her. Quiver was breathing but unconscious and not moving. Brown again started to leave. Sounding-

sides was lying on top of Valerie and yelling at Brown, saying, "Come on back, you chicken." Brown went home.

According to Roger Brown's statement, related to the jury over objection, at approximately 12:30 or 1:00 p.m. the next day Soundingsides came to Brown's residence and said Valerie was sick. Soundingsides wanted Brown to help summon an ambulance or a doctor, and they flagged down a man named Wilbur who took them back to Soundingsides' and Valerie's residence. Brown saw Valerie lying on a bed and felt for her pulse, but found she had none. Brown told Soundingsides Valerie was dead, and Soundingsides "just dropped his head." He then accompanied Wilbur to Wilbur's house, where they called the police. It is this recounting of Roger Brown's statement by Agent Brown which premises one of the critical hearsay issues raised.

At the conclusion of Agent Brown's direct testimony, the judge admonished the jury that Agent Brown's testimony about the October 27, 1985 interview was hearsay, admitted only for the limited purpose of determining whether Roger Brown was telling the truth "at this time or in these other previous interviews or was telling the truth in the interview of 1980." II R. 257. He made a similar admonition when he instructed the jury at the close of all the evidence. II R. 315.

After the prosecution rested, the defense offered no evidence. The trial judge denied Soundingsides' motion for a judgment of acquittal and the jury found Soundingsides guilty of second degree murder. Defendant was sentenced to thirty years' incarceration. This timely appeal followed.

## II

### Evidence of Other Wrongs

Soundingsides' first claim of error is that Gloria Goggles' testimony that Soundingsides beat her frequently during their relationship and caused her to lose their baby was not admissible under Rules 403 and 404(b) of the Federal Rules of Evidence. Rule 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The prosecuting attorney offered Gloria Goggles' testimony about Soundingsides' prior acts out of the hearing of the jury and explained that he wanted to use it to prove malice aforethought. II R. 164. As is required, *United States v. Kendall*, 766 F.2d 1426, 1436 (10th Cir.1985), *cert. denied*, — U.S. —, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986); *United States v. Biswell*, 700 F.2d 1310, 1317 (10th Cir.1983), the judge articulated the purpose for which he understood the Government was offering the evidence, namely "to show the disposition of the Defendant in order to prove intent ..." II R. 166. The judge cautioned the jury before Gloria testified and at the conclusion of the evidence that evidence of other acts was not admissible to prove "the character of a person in order to show that he acted in conformity therewith." II R. 168, 311–12. *See United States v. Kendall*, 766 F.2d at 1436–37; *United States v. Biswell*, 700 F.2d at 1317–18 & n. 5.

Gloria testified that she was 25 at the time of trial and 15 when she started dating Soundingsides, who was 14 then. He would slap her, hit her with his fist in the body or kick her, and this kind of treatment occurred practically everyday. II R. 171–72. She became pregnant with his child after "about a year and a half or so ..." One day when she was getting his pants to iron them, he was angry and put his arms around her and pushed in with his fingers where she was pregnant. She went into labor and the baby was born "by caesarean" and lived one night. *Id.* at 173. She later asked him to leave her and he started beating her, punching her and kicking her. Her stepfather stood up for her and Soundingsides finally left. *Id.* at 173–74.

The admissibility of the testimony must be considered here under the requirements

of Rule 403 for weighing the need for relevant evidence against unfair prejudice, and Rule 404(b) for admissibility of evidence of other crimes, wrongs or acts to prove intent, *inter alia.* This record shows first a plea of not guilty, which placed on the Government the burden of proving all essential elements of the offense of murder in the second degree. One element is malice aforethought as required by 18 U.S.C. § 1111(a). *United States v. Free,* 574 F.2d 1221, 1222 (1st Cir.), *cert. denied,* 439 U.S. 873, 99 S.Ct. 209, 58 L.Ed.2d 187 (1978).

The record shows further by the opening statement of defense counsel the basic position of Soundingsides for trial—that he had been denied the lost "rape kit" evidence which could prove he did not do the things he was accused of, II R. 60; that Roger Brown's and Kevin Jenkins' statements about his actions and admission of killing Valerie were unreliable because of their strong motivations, while in prison or jail respectively, to testify against Soundingsides. II R. 57–59. Thus the defense outlined did not suggest any claim that while he was involved in the acts charged, he did not have the malice aforethought required.[1]

■ We hold that in these circumstances the admission of the testimony by Gloria about the beatings over five years earlier and the death of the child was in error and an abuse of discretion. Its admission was error for the "fundamental reason that intent was not a genuinely contested issue." *United States v. Ring,* 513 F.2d 1001, 1007 (6th Cir.1975); *United States v. Shackleford,* 738 F.2d 776, 781–82 (7th Cir.1984). The practical reality was that intent was not raised as a defense. If Soundingsides were found to have done the violent acts of abuse to Valerie, as the photographs and the testimony of Dr. Harris portrayed them, then the element of malice was no real issue. "Proof of intent may be infera-

ble from the act itself." *United States v. Dancey,* 594 F.2d 905, 914 (2d Cir.), *cert. denied,* 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979).

■ Malice aforethought may be established by evidence of conduct which is reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that the defendant was aware of a serious risk of death or serious bodily harm. *United States v. Black Elk,* 579 F.2d 49, 51 (8th Cir.1978). If the Government has a strong case on the intent issue, as here, the extrinsic offenses may add little and consequently will be excluded more readily; if the defendant's intent is not contested, the incremental probative value of the extrinsic offense is inconsequential when compared to its prejudice. *United States v. Beechum,* 582 F.2d 898, 914 (5th Cir.1978), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979).

We faced a somewhat similar problem in *United States v. Franklin,* 704 F.2d 1183 (10th Cir.), *cert. denied,* 464 U.S. 845, 104 S.Ct. 146, 78 L.Ed.2d 137 (1983). In a prosecution under 18 U.S.C. § 245(b) (wilfully injuring "any person because of his race"), for killing two black men in Salt Lake City, evidence of a prior assault on an interracial couple in Washington, D.C. was admitted, and we affirmed. We said that though Franklin did not deny his racism, a racial motive was still an element to be proved; it was not necessary for the defendant to have raised the issue of intent for it to be an issue where the crime charged required such a specific intent. *Id.* at 1183. In contrast, here the charge of murder in the second degree did not require proof of a specific intent (wilful, deliberate, malicious and premeditated), but only a general intent to kill. *Kane v. United States,* 399 F.2d 730, 736 (9th Cir.), *cert. denied,* 343 U.S. 1057, 89 S.Ct. 698, 21 L.Ed.2d 699 (1969).[2]

---

1. This was the state of the record when the trial judge admitted the evidence, over objection, during the Government's case-in-chief. After the Government rested, Soundingsides presented no evidence. In closing argument his counsel reiterated the points in the opening state-

ment, saying the Government had proven there was a body, but not who committed the homicide. II R. 298.

2. This absence of a requirement of specific intent was the premise for an important instruc-

In *Franklin* we did point out that the defendant had given no enforceable pre-trial assurances that intent would not be an issue, and held the extrinsic act evidence admissible. 704 F.2d at 1188 and n. 3. To the extent it was inconsistent with the *Franklin* analysis, we declined to follow the holding in *United States v. Powell,* 587 F.2d 443, 448 (9th Cir.1978), that when participation in the acts charged is denied, intent is not a material issue for the purpose of applying Rule 404(b). However, we do not feel that *Franklin* calls for upholding the admission of Gloria's testimony here because of the degree of commitment of the defense to a position not challenging intent, the absence of a specific intent requirement here, and the fact that the required general intent was inferable from the nature of the acts proven. In *Franklin* we cited *United States v. Webb,* 625 F.2d 709, 710 (5th Cir.1980), which had emphasized the fact that the required intent was not inferable from the nature of the act done there, and upheld the admission of other act evidence. 704 F.2d at 1188.

In sum, we hold the admission of the highly prejudicial testimony of Gloria on the earlier wrongs by Soundingsides to her and her child was in error. There was no real intent issue and no specific intent was required to be proven. Since such evidence was inconsequential to the real issue tried, and its worth was overwhelmingly outweighed by its unfair prejudice, the admission of the testimony was an abuse of discretion and in error.

### III

**The Unavailability of Lost Evidence**

Due Process "requires the [Government] to disclose to criminal defendants favorable evidence that is material either to guilt or to punishment." *California v. Trombetta,* 467 U.S. 479, 480, 104 S.Ct. 2528, 2529, 81 L.Ed.2d 413 (1984). Soundingsides claims the trial court denied him due process when

tion in this case. *See* Part VI, *infra.* The jury was told that no intent of the type required here may be negated by evidence of intoxication for

he was not given access to "rape kit" evidence which Dr. Harris, the pathologist who examined Valerie's body, sent to the Bureau of Indian Affairs and which was subsequently lost. Appellant's Brief at 21–24.

Out of the hearing of the jury the trial judge heard defendant's motion to dismiss the indictment or, in the alternative, to exclude Dr. Harris' pathology report, photographs and testimony. The prosecuting attorney explained in response that after completion of the autopsy, Dr. Harris forwarded the rape kit and the evidence removed from the body to the Bureau of Indian Affairs Police, who in turn swore they sent it on to the State Crime Laboratory. The laboratory, however, had no record of receiving the kit, and a search by the prosecuting attorney failed to disclose any record of the laboratory receiving it. II R. 72. The prosecuting attorney said that Dr. Harris' autopsy report only referred to the fact that he observed spermatozoa in a sample he took from a moist spot on the body and that he did not intend to offer any results of the laboratory's tests except to show Dr. Harris found the sperm on the body to corroborate Roger Brown's expected testimony that on the night of her death, Valerie's pants were down and Soundingsides was on top of her, asking Brown to join in. II R. 73, 76.

Defense counsel said the Government attorney's opening statement that Roger Brown would testify he saw Soundingsides lying on top of Quiver with her pants pulled down and Dr. Harris' expected testimony that he found sperm on the body would leave the jury "with an open-ended opportunity" to conclude there was sperm on the body and that it belonged to Soundingsides. He said that from the rape kit evidence "it is possible in many instances to determine from an examination of spermatozoa whether or not the individual that deposited that spermatozoa [is] a secretor and if so, the blood type of the secretor"

the defendant to be found guilty of second degree murder.

and that the evidence was exculpatory because it might show the blood type of the person who deposited the semen was not the same as his client's. Defense counsel argued that the loss of this "potentially exculpatory" evidence occurred because of the "omission or ... negligence" of the Government or its agents. II R. 74–76.

The trial judge said he did not see how the rape kit was exculpatory and ruled that Dr. Harris could testify he found spermatozoa on Quiver's body. However, he said the Government could not introduce the crime lab report in evidence. II R. 76–78.

During cross-examination, Dr. Harris testified he tested the moisture to see if it was semen and combed the pubic hair so the crime lab could determine if any pubic hair on the body matched that of the defendant. II R. 150–51. He said he gave this evidence to an examining officer with the Bureau of Indian Affairs, who in turn gave it to the F.B.I. Some of the evidence, however, was lost, and Dr. Harris testified he had not received any report back on it. During redirect examination, Dr. Harris testified he found "multiple, well-formed sperm" from the smear he made from the wet spot near the victim's anus. II R. 152–53.

On appeal, Soundingsides argues that the lost evidence Dr. Harris testified about "could have exonerated" him from any wrongdoing in the case and that the indictment should have been dismissed or Dr. Harris should not have been allowed to testify and the government attorney not allowed to refer to the spermatozoa found on Quiver's body. Appellant's Brief at 23–24. Soundingsides does not claim the Government and State Crime Lab did not act in good faith or in accord with their normal procedures.

The Supreme Court laid down a two-part "standard of constitutional materiality" to be applied when, while "acting in good faith and in accord with their normal practice," *Trombetta*, 467 U.S. at 488–89, 104 S.Ct. at 2533–34 *quoting Killian v. United States*, 368 U.S. 231, 242, 82 S.Ct. 302, 308, 7 L.Ed.2d 256 (1961), Government officials

nevertheless lose or destroy evidence the defendant deems exculpatory:

[E]vidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Trombetta*, 467 U.S. at 489, 104 S.Ct. at 2534.

Assuming Soundingsides would be unable to obtain comparable evidence by other reasonably available means, he nevertheless has failed to demonstrate that the lost evidence had sufficient exculpatory value to satisfy *Trombetta*'s standard of constitutional materiality. "*Trombetta* makes clear that the mere possibility that evidence might aid the defense does not satisfy the constitutional materiality standard...." *United States v. Fletcher*, 801 F.2d 1222, 1225 (10th Cir.1986), *quoting United States v. Webster*, 750 F.2d 307, 333 (5th Cir.1984), *cert. denied*, 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985). The exculpatory potential of evidence must be based on more than "speculation and conjecture." *United States v. Martinez*, 744 F.2d 76, 80 (10th Cir.1984).

As was explained in *Hilliard v. Spalding*, 719 F.2d 1443 (9th Cir.1983), in a prosecution for rape, seminal fluid found in the vaginal tract is extremely probative of whether the accused committed the rape for which he is on trial:

In a rape case, it is possible to test a sample of seminal fluid taken from the victim and compare it with samples of a defendant's saliva and blood. The results of such a test cannot positively identify a defendant as the perpetrator, but the test *can* conclusively exculpate an individual if the blood types do not match.

719 F.2d at 1445 (emphasis in original). Because of the strong possibility that the victim's seminal sample might exculpate a rape defendant, the court ruled that since the Government had lost the sample and deprived the defendant of an opportunity to test it, the court would assume that the

loss prejudiced the defendant, and that, in the future, if the Government takes a semen sample from a rape victim it must make the sample available for the defendant to test even if the defendant does not request it. 719 F.2d at 1447.

However, Soundingsides was on trial for second degree murder, not rape. The prosecution offered Dr. Harris' testimony about the sperm he found on the victim's body only to corroborate Roger Brown's expected testimony that he saw Soundingsides lying on top of Valerie in the alfalfa field the night of her murder. It is impossible to know whether or not the semen sample matched Soundingsides' semen. If it did, it would not conclusively establish that he had sex with Valerie the night of her death, although it would tend to corroborate Roger Brown's statement to the F.B.I. in October 1985. On the other hand, if the semen sample in the rape kit did not match Soundingsides' semen, it would only call into question Brown's October statement by proving Soundingsides did not have sex with Quiver before she died. It would not prove that he did not kill her.

■ Because the evidence is not directly probative of any element of the crime of second degree murder, and because there is only a possibility it would establish that the sperm found on Valerie's body was not Soundingsides', "the chances are extremely low" that the lost rape kit evidence would have been exculpatory. *Webster*, 750 F.2d at 333, *quoting Trombetta*, 467 U.S. at 489, 104 S.Ct. at 2534.[3] The trial judge did not err in his handling of Dr. Harris' testimony about the rape kit or the spermatozoa he found on Quiver's body.

## IV

### Admission of the Unsworn, Out of Court Statements

Soundingsides argues that the trial judge erred by allowing Agents Safarik and William Brown to testify in court about their hand written summaries of prior statements by Kevin Jenkins and Roger Brown. He says that each of these witnesses had acknowledged in court making the statements contained in the summaries which were inconsistent with their testimony at trial. Therefore, these prior inconsistent statements were not properly needed or admitted for impeachment and the effect of their admission was to put them before the jury for the truth of the information they contained. Appellant's Brief at 28–32; Reply Brief at 19–21.

"[T]he testimony of a witness, after a proper foundation has been laid, may be impeached by showing former declarations, statements, or testimony which are contradictory or inconsistent with the answers given at a trial." *United States v. Neal*, 452 F.2d 1085, 1086–87 (10th Cir.1971), *quoting Brooks v. United States*, 309 F.2d 580, 582 (10th Cir.1962). However, "where it is sought to impeach a witness by showing a prior inconsistent statement and the witness admits the prior inconsistent statement, the witness is thereby impeached and further testimony is not necessary." *United States v. Jones*, 578 F.2d 1332, 1340 (10th Cir.), *cert. denied sub nom. Janko v. United States*, 439 U.S. 913, 99 S.Ct. 284, 58 L.Ed.2d 259 (1978). Where the witness does not deny making a prior inconsistent statement, "there is clearly no rationale for the introduction of a prior 'inconsistent' statement...." *United States v. Ballivie-ro*, 708 F.2d 934, 939–40 (5th Cir.), *cert. denied*, 464 U.S. 939, 104 S.Ct. 351, 78 L.Ed.2d 316 (1983).

When the Government attorney showed Kevin Jenkins Agent Safarik's summary of Jenkins' comments during their interview and asked him if he told Agent Safarik the statement was true, Jenkins replied, "I guess so." Jenkins reiterated this admission when the Government attorney pressed him further on the point after Agent Safarik's statement was marked as

---

**3.** The indictment does not charge Soundingsides with felony murder.

an exhibit.[4] II R. 212, 214. Thus, Jenkins had admitted making the prior inconsistent statements which the Government presented through the testimony of the FBI agent Safarik.

As noted earlier, Roger Brown, an El Reno inmate, was called by the Government. The Government asked him about his statement in the October 1985 third interview with FBI Agent William Brown. This was the statement in which Roger said that he had seen Soundingsides go into the field, kick and beat Valerie there, and pull down her trousers. Roger Brown denied on the stand that this was true. When he was asked about telling the FBI agents that he saw Soundingsides beat Valerie in the field, he said he had been alone at that time in the penitentiary and "had no lawyer or nothing." II R. 237. Thus, in effect there was an acknowledgement of the prior inconsistent statement and no denial of its having been made. If a witness admits making prior inconsistent statements, "there is no necessity for further proof, as by the admission of the prior inconsistent written statement." *Ditrich v. United States*, 243 F.2d 729, 731 (10th Cir.1957); *see also United States v. Jones*, 578 F.2d at 1340; *United States v. Balliviero*, 708 F.2d at 939-40; *McCormick On Evidence*, Cleary ed. § 37 at 79 (3d ed 1984).

■ In sum, it was error to admit the testimony of the FBI agents, over hearsay objections, relating the Kevin Jenkins and Roger Brown statements. In view of the admissions that had been made, the exception allowing admission of hearsay statements for impeachment purposes did not apply.

## V

### The References to the Polygraph

Soundingsides claims that error occurred during Roger Brown's testimony; that both the Government attorney and Roger referred to a polygraph examination given to Roger, apparently when FBI Agent William Brown interviewed him in February 1985 at the El Reno prison, II R. 236-38, 251; that these polygraph results improperly suggested that the February 1985 statements by Roger should not be believed by the jury, but that it should believe the later statements of Roger implicating Soundingsides.

■ "Evidence that the accused or a witness has taken a polygraph test is inadmissible." *United States v. Brevard*, 739 F.2d 180, 182 (4th Cir.1984); *see United States v. Holman*, 680 F.2d 1340, 1352 (11th Cir. 1982). "In this Circuit, polygraphs are not admissible to show that one is truthful."

---

**4.** Jenkins testified about Safarik's written version of Jenkins' statement as follows (II R. 212):

> Q. And you told him that it was accurate. In fact, where these three words are crossed out and put in here, leaving the state, that was a correction that was suggested by you, wasn't it?
> A. Yeah, I was leaving the state.
> Q. And so that was the only thing on the statement that you wanted Mark Safarik to correct?
> A. *I guess so.*
> Q. All right. And you told him at the time that what you said in the statement was true, didn't you?
> A. I can't remember.
> Q. Did you tell him it was true?
> A. *I guess so.*
> (Emphasis added).
> Jenkins further testified as follows (II R. 213–14):

> Q. (BY MR. KERN) One of the things you said to Mr. Safarik, as a matter of fact, was that Reno told you that he had killed Valerie Quiver?
> A. He just told me, man, the cops that it was him.
> Q. Did he tell you?
> A. He got picked up and incarcerated and questioned, but they didn't have any evidence so they had to let him go.
> Q. Did he tell you that he killed Valerie Quiver?
> A. I'm not sure. Everytime I was with Reno we were drinking, man, everybody was bombed.
> Q. But you were sure when you told that to Mark Safarik.
> A. I wasn't sure.
> Q. You reviewed this, didn't you, you told him it was correct, didn't you?
> A. *I said I guess so, man.*
> II R. 213-14. (Emphasis added).

*United States v. Hall,* 805 F.2d 1410, 1416 (10th Cir.1986). We are convinced the reference here to the test as indicative of the facts and to contradict the witness was likewise impermissible. The trial judge recognized the inadmissibility of the polygraph references, sustained an objection to them and instructed the jury to "disregard any testimony or inferences regarding the polygraph." II R. 237, 248.

We need not decide whether the instruction removed the damage since the case must be reversed for a new trial on other grounds. We have discussed the point so that it will be clear to counsel, and through them to their witnesses, that such statements must not be made on retrial. The trial judge's ruling on inadmissibility of the evidence, with which we agree, and this discussion should make clear that the references must be avoided at the retrial.

## VI

### The Instruction on Drunkenness

The trial judge instructed the jury that: [A]lthough intoxication or drunkenness alone will never provide a legal excuse for the commission of a crime, the fact that a person may have been intoxicated at the time of the commission of a crime may negate the existence of a specific intent. However, no intent of the type which might be negated by evidence of intoxication is necessary for a Defendant to be guilty of second degree murder or voluntary manslaughter.
II R. 309–310.

Relying on *United States v. Yazzie,* 660 F.2d 422 (10th Cir.1981), *cert. denied,* 455 U.S. 923, 102 S.Ct. 1282, 71 L.Ed.2d 464 (1982), and referring to the evidence in the record that Soundingsides had been drinking the day of Valerie Quiver's death, II R. 199–203, 232, Soundingsides argues that there was error in the part of this instruction which stated that intoxication does not negate the type of intent needed for second degree murder. He says this error precluded the jury from properly considering whether Soundingsides had the state of mind necessary to commit second degree murder or whether, instead, he should have been convicted of manslaughter. Appellant's Brief at 33–35.

■ The *Yazzie* case does not support Soundingsides' position. A portion of the instruction given there does agree with Soundingsides, but our opinion held only that "intoxication is no defense at all to a charge of voluntary manslaughter, regardless of the manner of its attempted use." 660 F.2d at 421. The crimes of second degree murder (18 U.S.C. § 1111) and voluntary manslaughter (18 U.S.C. § 1112) do not require a specific intent (wilful, deliberate, malicious and premeditated), as distinguished from a general intent to kill. Therefore as to them the exculpatory rule, under which drunkenness may be taken into account to show that a particular state of mind or a specific intent, was present, does not apply. *Kane v. United States,* 399 F.2d 730, 736 (9th Cir.1968), *cert. denied,* 393 U.S. 1057, 89 S.Ct. 698, 21 L.Ed.2d 699 (1969). The instruction given here was in agreement with this rule and we have indicated our approval of such a charge. *See United States v. Shuckahosee,* 609 F.2d 1351, 1356 and n. 11 (10th Cir.1979), *cert. denied,* 445 U.S. 919, 100 S.Ct. 1283, 63 L.Ed.2d 605 (1980).

We hold that the instruction was correct.

## VII

### Admission of the Autopsy Photos

Soundingsides argues further that under Federal Rule of Evidence 403 the trial judge should have excluded the autopsy slides and photographs admitted in conjunction with the testimony of the pathologist, Dr. Harris. He says the prejudicial impact of this evidence far exceeded its probative value and that it was cumulative of the already admitted photographs, and the corresponding slides, taken at the scene where investigators found Valerie's body. Appellant's Brief at 36–37.

■ "The admission of photos in a homicide case is a matter within the sound dis-

cretion of the trial court." *United States v. Cline,* 570 F.2d 731, 734 (8th Cir.1978). We will not disturb the trial court's decision to admit or reject the photographs and slides into evidence in the absence of "a clear showing of abuse of discretion." *United States v. Whitfield,* 715 F.2d 145, 147 (4th Cir.1983). *See also United States v. Goseyun,* 789 F.2d 1386, 1387 (9th Cir. 1986) ("The trial judge's exercise of discretion in balancing the prejudicial effect and probative value of photographic evidence of this type is rarely disturbed").

Here the prosecuting attorney made an offer of proof out of the hearing of the jury, consisting of the photographs Dr. Harris had taken during his autopsy of the body at the morgue and the corresponding slides made from these photographs. II Supp.R.Gov't. exh. 21–48, 21A–48A. He said they would show the extent of the injuries and the cause of death. Defense counsel objected that the photographs and slides were "not necessarily relevant," were "so outrageous that they are much more likely to inflame the jury than to produce any appropriate evidence," and were "simply redundant" because they duplicated the photos and slides taken at Soundingsides' shack when investigators first found the body there. II R. 121–22, 125; III Supp.R.Gov't.Exh. 3A–15A.

The trial judge admitted the photos and slides subject to Dr. Harris' being able to show that each one had a probative purpose. Although he found the photos "a little gory," he said they were not "much worse than those we've already seen without this objection being made" and they would have a probative purpose if they showed "something that couldn't be otherwise seen." He asked if defense counsel wanted an instruction to the jury on them, but defense counsel did not ask for one. II R. 124–25.

■ For the reasons the trial judge articulated, we hold he did not abuse his discretion in admitting the autopsy photos and slides. Although the photos and slides were undeniably gruesome, "gruesomeness alone does not make photographs inadmissible." *United States v. Naranjo,* 710 F.2d 1465, 1468 (10th Cir.1983). These photos and slides "were a substantial aid in illustrating the testimony of the pathologist," *United States v. Cline,* 570 F.2d at 734, and they had considerable probative value not only in proving the nature of Valerie's injuries and the cause of her death, but also on the issue of malice aforethought. In light of this probative worth, their admission was not unduly prejudicial. *See, e.g., Whitfield,* 715 F.2d at 147–48; *United States v. Kaiser,* 545 F.2d 467, 476 (5th Cir.1977); *United States v. Fleming,* 594 F.2d 598, 607–08 (7th Cir.1979); *United States v. Goseyun,* 789 F.2d at 1387; *Naranjo,* 710 F.2d at 1468–69. Nor are they cumulative since, as the judge pointed out, they depict the body from different angles and vantage points than do the photos taken when investigators first discovered the body and thereby gave the jury a more complete understanding of the injuries.

## VIII

### The Cumulative Effect of the Errors

Further, Soundingsides argues that the cumulative effect of the erroneous admissions of evidence requires reversal. He also contends that without the improperly admitted evidence, there was no evidence whatsoever that he was responsible for Valerie's death. Brief of Appellant, 38–40.

■ We agree that the conviction must be reversed for reasons already given. Without the improperly admitted evidence it is true that the case against Soundingsides is only a weak one of circumstantial evidence. We feel, however, that the record is such that we should not hold that the case should be dismissed. *See Bailey v. United States,* 410 F.2d 1209, 1215–16 (10th Cir.), *cert. denied, sub nom. Freeman v. United States,* 396 U.S. 933, 90 S.Ct. 276, 24 L.Ed.2d 232 (1969).[5]

---

5. The main issue at trial was whether Soundingsides committed the killing. Considering the evidence in the light most favorable to the Government, the jury could have inferred that

## IX

### Conclusion

Due to the prejudicial effect of the evidence erroneously admitted, the conviction

he committed the fatal assault from a variety of circumstantial evidence, including the bruises the police who investigated the scene saw on his hands the day after the killing, although he also had a fight with George Willow on December 11; Soundingsides' nervousness and lack of grief for the victim the day after the murder, II R. 65–66, 102; a bloodied sled seen leaning against the side of Soundingsides' shack; sled tracks seen leading from the field the day after the murder, II R. 98–99, 103; III Supp.R.Gov't. Exh. 16A–17A; and the position in which the pathologist found Valerie's head when he went to Soundingsides' shack to investigate, which

must be reversed, and the case is remanded for a new trial.

REVERSED and REMANDED.

seemed odd to him in view of the fact that a person would normally tilt the head of a merely unconscious person back so as to clear the airways. II R. 131–32.

On the issue of malice aforethought, the evidence includes the brutality of the beating itself as inferred from the injuries Valerie sustained and testimony, properly admitted, by several witnesses who said they saw Soundingsides beat her on several occasions, including the afternoon of the day she died. II R. 187, 231; II Supp.R.Gov't.Exh. 21A–48A; III Supp.R.Gov't. Exh. 4A–15A.