**UNITED STATES of America,
Appellee,**

v.

**William JEWETT, Appellant.**

**No. 20473.**

United States Court of Appeals,
Eighth Circuit.

Feb. 18, 1971.

Certiorari Denied May 3, 1971.
See 91 S.Ct. 1640.

496

William D. Kenyon, Sioux Falls, S. D., for appellant.

R. D. Hurd, Asst. U. S. Atty., Sioux Falls, S. D., William F. Clayton, U. S. Atty., Sioux Falls, S. D., for appellee.

Before Mr. Justice CLARK,* and VAN OOSTERHOUT and GIBSON, Circuit Judges

VAN OOSTERHOUT, Circuit Judge.

Defendant William Jewett has taken this timely appeal from judgment of conviction entered upon a jury verdict of guilty on an indictment charging defendant with second degree murder in violation of 18 U.S.C.A. § 1153.

* The Honorable Tom C. Clark, Retired Associate Justice of the United States Supreme Court sitting by special designation.

Defendant attacks the validity of his conviction on two grounds: (1) The court erred in admitting the testimony of Mr. Ashton, realty officer of the Cheyenne River Agency, to the effect that his record showed Indian title had not been extinguished to the land on which the crime was committed over defendant's best evidence objection. (2) The court erred in giving an instruction to the jury reading:

"If you find that the defendant was legally insane at the time the criminal act he is charged with occurred, but you find beyond a reasonable doubt that his mental disability was the result of his voluntarily drinking alcoholic beverages, and if you further find beyond a reasonable doubt that he was aware of the effects of his drinking alcoholic beverages, then the defendant's mental disability does not relieve him of criminal responsibility."

We find the errors asserted lack merit and affirm the conviction.

▆▆ Eighteen U.S.C.A. § 1153 gives federal courts jurisdiction over certain major crimes including murder committed by an Indian in Indian country. To establish jurisdiction, the burden is on the Government to prove that the major crime was committed by an Indian in Indian country. It is stipulated that defendant is an Indian. Defendant contends the Government has failed to establish by competent evidence that the murder was committed in Indian country. The definition of Indian country here pertinent as stated in 18 U.S.C.A. § 1151(c) includes, "all Indian allotments, the Indian titles to which have not been extinguished * * *."

The murder for which the defendant was prosecuted took place at the Noisy Hawk residence which is located on the portion of the Cheyenne River Indian Reservation which has been allotted to Indians but was open to white settlement. Thus jurisdiction of the offense charged exists only if the Indian title to the Noisy Hawk residence has not been extinguished.

Mr. Ashton, realty officer of the Cheyenne River Indian Reservation Agency of the Bureau of Indian Affairs, testified that records of transfers of Indian lands from the time of the trust patent were kept in his office; that maintenance of such records was necessary for the purpose of carrying out the functions of the office; that each allotment was assigned a tract number and that a card record was kept with respect to the title to each tract. The number assigned to the tract occupied by Noisy Hawk was 2298. The record shows the trust patent and a number of transfers to Indians through inheritance. The last entry is a deed from the Indian owners to the United States in trust for the Cheyenne River Sioux Tribe, approved by the Secretary of Interior October 4, 1940. A certified copy of the deed was produced and received in evidence. Mr. Ashton testified that he had made a search of the records of his office and that it revealed no subsequent transfers of the title and that the Indian title had never been extinguished.

Mr. Ashton further testified that he confirmed his finding that the trust status of the Noisy Hawk tract continued to exist by telephone with the principal office of records at Aberdeen. The consent of the Secretary of Interior is necessary for a conveyance of trust land to a non-Indian. The agency office handles through the Secretary of Interior all disposals of trust lands and keeps a record thereof. Mr. Ashton as realty officer makes reports of alienated land to State authorities so that such land can be taxed. Tract 2298 has never been taxed.

▆▆ Defendant objected to the foregoing testimony upon the basis of best evidence rule. The admission of secondary evidence is within the broad discretion of the trial judge. United States v. Covello, 2 Cir., 410 F.2d 536, 543. We find no abuse of discretion.

Moreover, it is extremely doubtful whether the evidence just discussed falls within the best evidence rule. The evidence shows that Mr. Ashton's office

was required to and did keep track of title to Indian trust land for the purpose of performing the required functions of the agency office. It is reasonably certain that accurate records were kept on the tract sheets as to the title status of Indian land.

To establish the fact that there is no record as to a particular matter or thing, parol evidence may be given. The proof may be given by any qualified person as well as the custodian. Aiuppa v. United States, 10 Cir., 393 F.2d 597; Jackson v. United States, 5 Cir., 250 F. 2d 897, 901. The defendant has failed to demonstrate that any prejudicial error was committed in receiving the evidence that Indian title to the Noisy Hawk tract had never been divested. Substantial evidentiary support exists for the court's determination that the crime occurred in Indian country and hence jurisdiction is established.

■ We now reach the second asserted error which relates to the voluntary intoxication instruction quoted at point (2). We shall first summarize the background facts.

On the evening of December 5, 1969, defendant went to the Noisy Hawk home. With no provocation, he ordered everyone out of the house. All left except seventy-seven year old John Crow Eagle, who was sleeping in the bedroom. Crow Eagle died as a result of a severe beating inflicted by defendant. The defendant was arrested later that evening by four officers who testified that they smelled liquor on his breath; that defendant staggered; that he was glassy eyed, and that his speech was slurred.

Defendant's only defense at the trial was that he was insane at the time of the crime and hence not legally responsible for his acts.

Defendant is a thirty-year old Indian with an IQ of 70. In 1961 he was struck on the head with an axe which penetrated his brain. He received extensive treatment for such injury. He spent three and one-half years at the South Dakota Mental Hospital at Yankton between 1964 and 1969. He was discharged as sane in April 1969.

Dr. Behan, Superintendent of the Mental Hospital, a qualified psychiatrist, called as a witness by defendant, testified that defendant is not insane except when he has a psychotic episode induced by drinking alcoholic beverages. In response to a question as to defendant's ability to know the difference between right and wrong at the time of the killing, Dr. Behan testified: "Well, I think under the influence of alcohol and with the situation as it was described, I think that he did not."

The court submitted the defense of insanity to the jury by elaborate instructions which are not challenged except with respect to the voluntary intoxication instruction.

Dr. Behan, who was the only psychiatrist to appear as a witness, included the following in his testimony:

"Well, it was felt that he had suffered brain trauma from this hatchet incident; that he suffered epileptic seizures, which we were able to control with medication. That he had sort of an explosive personality, and basically, he had problems with alcohol. He was considered a periodic drinker. When he did drink, he not infrequently became quite violent, and sometimes had psychotic episodes."

\* \* \* \* \* \*

"In other words, when he's released from the hospital, he's in shape to be released, and he usually is under medication. He frequently has little or no problem while in the hospital. It's when he starts drinking that the lid blows off."

\* \* \* \* \* \*

"Q In other words, is the alcohol a necessary and vital ingredient in order for the defendant to become psychotic?

A In most instances, as far as we know, yes. This is what takes the lid off."

Dr. Behan further testified that it was part of the standard procedure at

the State Hospital to warn those who were taking drugs not to drink alcoholic beverages and that defendant possessed sufficient awareness, intelligence and mental capacity when he was not drinking to be aware of the effect alcohol has on him and that he had the ability to exercise a choice as to whether or not to drink alcoholic beverages.

Thus there is substantial evidence in the record to support the instruction given. SDCL 1967, 22–5–5 reads:

"No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time in determining the purpose, motive, or intent with which he committed the act."

The South Dakota Supreme Court interprets this statute in Utsler v. State, 171 N.W.2d 739, 741, as follows:

"Intoxication is not a defense in South Dakota, but sufficient evidence of it could vitiate the specific intent which is an essential element in proving guilt of certain crimes. State v. Kapelino, 20 S.D. 591, 108 N.W. 335; Goings v. United States, 8 Cir., 377 F.2d 753. See also Annot., 8 A.L.R.3d 1236. In discussing *voluntary intoxication*, at page 1239, the annotator says, that discussion would seem to occupy the field for the decisions seem to indicate 'that it is only where the alcohol is introduced into the accused's system by force majeure that the intoxication would be regarded as involuntary for the purposes of the application of these rules. The courts in considering the questions here discussed have taken little or no notice of modern medical attitudes toward alcoholism as a disease, but have usually assumed that the intoxication must be treated as voluntary for purposes of

determining criminal guilt, no matter how compulsive the accused's addiction to alcohol may have been. It is apparently only when the alcoholism produces a permanent and settled insanity distinct from the alcoholic compulsion itself that the law will accept it as an excuse.' See also Choate v. State, 19 Okl.Cr. 169, 197 P. 1060."

See extensive annotations, Voluntary Intoxication—Defense, 8 A.L.R.3d 1236.

Strong support for the instruction given is found in Kane v. United States, 9 Cir., 399 F.2d 730. Additionally, on the issue of whether conviction of a murder in the second degree requires proof of specific intent, the court holds:

"The included crimes of murder in the second degree (18 U.S.C. § 1111) and voluntary manslaughter (18 U.S.C. § 1112), do not require a specific intent (willful, deliberate, malicious and premeditated), as distinguished from a general intent to kill, and therefore, as to them, the exculpatory rule is inapplicable. See Bishop v. United States, 71 App.D.C. 132, 107 F.2d 297, 302–303." 399 F.2d 730, 736.

In Powell v. Texas, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1054, the Supreme Court affirmed a conviction for public intoxication of a chronic alcoholic. The Court rejected the tendered defense that chronic alcoholism is a disease and that by reason thereof defendant could not be punished for the offense of public intoxication. As a basis for so doing, the Court states:

"We cannot cast aside the centuries-long evolution of the collection of interlocking and overlapping concepts which the common law has utilized to assess the moral accountability of an individual for his antisocial deeds. The doctrines of *actus reus, mens rea,* insanity, mistake, justification, and duress have historically provided the tools for a constantly shifting adjustment of the tension between the evolving aims of the criminal law and changing religious, moral, philosophical, and medical views of the nature of man. This process of adjustment

has always been thought to be the province of the States."

\* \* \* \* \* \*

"It is simply not yet the time to write into the Constitution formulas cast in terms whose meaning, let alone relevance, is not yet clear either to doctors or to lawyers." 392 U.S. 514, 535, 536, 537, 88 S.Ct. 2145, 2156.

We hold the court committed no error in giving the challenged instruction.

The judgment of conviction is affirmed.