**UNITED STATES of America,**
**Appellee,**

v.

**Ronald Harold KOHLMAN, Appellant.**

**No. 889, Docket 72-1393.**

United States Court of Appeals,
Second Circuit.

Argued Aug. 16, 1972.

Decided Oct. 5, 1972.

---

R. William Stephens, Buffalo, N. Y., for appellant.

Philip B. Abramowitz, Asst. U. S. Atty. (John T. Elfvin, U. S. Atty., W. D. N. Y., Buffalo, N. Y., of counsel), for appellee.

Before MANSFIELD and TIMBERS, Circuit Judges, and GURFEIN, District Judge.*

MANSFIELD, Circuit Judge:

On January 27, 1972, Ronald Kohlman, after a four-day jury trial, was found guilty of both counts of a two-count indictment charging him with robbery and larceny of a federally insured bank, 18 U.S.C. §§ 2113(a) and (b). On February 22, 1972, he was sentenced to concurrent terms of five years imprisonment on each count. We affirm.

The evidence of Kohlman's commission of the robbery, which was overwhelming, established that on the afternoon of August 23, 1971, he entered the Jefferson-Landon branch of the Marine Midland Bank-Western in Buffalo, handed the teller a note which read "This is a holdup. Give me all or you die," received from the teller $2,600, including some "bait-money," in a white Marine Midland bag, and departed. Bank photographs, upon development, revealed the

robber to be Kohlman, who was known to the Buffalo police. At 9:00 P.M., approximately 6½ hours after the robbery, they arrested him in a Buffalo motel room, where they found the white bank bag containing approximately $2,100, including some of the "bait-money." In addition to his being identified by the clear photographs, Kohlman was positively identified by the bank teller and by his fingerprint on the robbery note handed to her.

Faced with overpowering proof of guilt, Kohlman tendered the defense of temporary insanity allegedly triggered by his voluntary consumption of alcohol prior to the offense. Two defense psychiatrists, Drs. Sebastian Fasanello and Bruce Block, testified that Kohlman lacked the substantial capacity to conform his conduct to the requirements of law, one being of the opinion that he also lacked capacity to appreciate the wrongfulness of his conduct. See United States v. Freeman, 357 F.2d 606, 622 (2d Cir. 1966); United States v. Currier, 405 F.2d 1039, 1042 (2d Cir. 1969), cert. denied, 395 U.S. 914, 89 S.Ct. 1761, 23 L.Ed.2d 228 (1969). Their testimony was based on (1) information privately received from Kohlman (who did not testify) and from his father (who did testify) to the effect that Kohlman had consumed a substantial amount of alcohol before the robbery and (2) upon hospital records revealing a history of chronic alcoholism and illness that had necessitated serious surgery, including removal of 80% of his stomach and part of one lung. The psychiatrists testified that when Kohlman was not under the influence of alcohol he was competent and well-oriented but that upon his ingestion of alcohol his personality underwent a Jekyll-Hyde change, transforming him into an unreasonably negative, immature and impulsive person, easily aroused to anger, even by minutiae, and sometimes violently destructive.

* Of the United States District Court for the Southern District of New York, sitting by designation.

In rebuttal the Government challenged the underlying assumption that Kohlman was intoxicated at the time of the robbery. Upon cross-examination Kohlman's father admitted that he had failed to mention to the FBI, when he was questioned shortly after the robbery, the substance of an account to which he testified at trial to the effect that following his son's visit to the father's home on the morning of the date of the robbery the father had missed a quart of wine and a six-pack carton of beer. The father conceded upon cross-examination that his memory had faded and had been better when he had talked with the FBI. The Government further offered the testimony of a taxi driver to the effect that when he picked Kohlman up on the afternoon of August 23, 1971, shortly after the robbery, Kohlman was not drunk, and the testimony of the teller-victim that at the time of the robbery she did not smell any liquor on Kohlman's breath and that he walked "normally and slowly." Lastly, the Government pointed to psychiatric records describing Kohlman as an "unreliable historian."

The Government further offered by way of rebuttal the testimony of a forensic psychiatrist, Dr. Michael Lynch, to the effect that even if Kohlman were intoxicated at the time of the robbery he was still competent according to the *Freeman* standard. Dr. Lynch testified that he diagnosed Kohlman not as a psychotic but as an "antisocial" or "psychopathic personality" who appreciated the wrongfulness of his conduct and could conform it to the requirements of law. Drinking was described as a frequent characteristic of such a personality. As an aid in explaining to the court and jury the basis of his opinion Dr. Lynch used charts, approximately 2 by 3 feet in size, which listed a diagnostic classification of mental illnesses according to a manual published by the American Psychiatric Association, setting forth in red magic-marker ink classes of mental disorders deemed to be psychotic and in black those considered non-psychotic.

He testified that the former represented conditions that usually relieved an individual of criminal responsibility whereas the latter usually did not.

■ Kohlman contends that since it is not necessary for a defendant to be psychotic in order to be found not legally responsible for the commission of a crime, the admission of Dr. Lynch's testimony was error. While we agree that the label assigned by psychiatrists to a mental condition does not control the legal standard to be applied, see e. g., Washington v. United States, 129 U.S. App.D.C. 29, 390 F.2d 444 (1967), the issue is not presented by the record before us. Dr. Lynch's opinion did not limit itself to the sharp line suggested by Kohlman. While emphasizing the difference in mental capacity of the two groupings (psychotic and psychopathic), he further testified that a non-psychotic or an anti-social person might sometimes be unable to appreciate the wrongfulness of his conduct. Judge Curtin, furthermore, properly instructed the jury to be guided by the *Freeman* standard. If anything, his rulings gave Kohlman the benefit of every doubt, since it is questionable whether proof of a psychopathic personality induced by voluntary drunkenness would constitute sufficient evidence of insanity to require the Government to assume the burden of proving sanity beyond a reasonable doubt. See United States v. Currier, 405 F.2d 1039, 1042 (2d Cir. 1969), cert. denied, 395 U.S. 914, 89 S.Ct. 1761, 23 L.Ed.2d 228 (1969); United States v. Jewett, 438 F. 2d 495 (8th Cir.), cert. denied, 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 117 (1971) (voluntary intoxication insufficient); Kane v. United States, 399 F.2d 730, 736 (9th Cir. 1968), cert. denied, 393 U.S. 1057, 89 S.Ct. 698, 21 L.Ed.2d 699 (1969) (disability caused by consumption of liquor "cannot be classified as a mental illness excusing criminal responsibility").

■■ The principal error claimed by Kohlman arises out of the prosecutor's interrogation of the two defense psychi-

atrists with respect to Kohlman's history of numerous arrests for assault, disorderly conduct, failure to support his family, and discharge from the United States Navy after he had gone AWOL on at least four occasions. Except for one mention by a Government witness, evidence of Kohlman's prior arrests had been initially introduced by defense counsel through the psychiatrists as part of a strategy designed to show that Kohlman's repeated anti-social conduct, involving assaults and destruction of property, accompanied by drinking, evidenced a substantial lack of capacity to conform his conduct to the requirements of law, which would constitute a defense under *Freeman*. Indeed, the opinions of Drs. Fasanello and Black were largely based on Kohlman's anti-social behavior. While we cannot fault Kohlman's counsel for adopting that strategy, particularly in view of the overwhelming proof that Kohlman had robbed the Buffalo bank, the obvious and calculated risk was that the prosecutor would, as he had a right to do, exploit the evidence as a source of such contrary inferences as might be drawn. Having failed in his defense based on the evidence, Kohlman cannot now be heard to protest that he was unfairly prejudiced by the normal consequences of his counsel's considered strategy. See United States v. Pordum, 451 F.2d 1015, 1017 (2d Cir. 1971), cert. denied, 405 U.S. 998, 92 S.Ct. 1249, 31 L. Ed.2d 467 (1972). The only reference to an arrest prior to the initiation of the subject by defense counsel was when an employee of the Buffalo Police Department, upon cross-examination by defense counsel as to whether he "knew" Kohlman, replied "I knew him. I had arrested him before, yes, sir." Taking into consideration that the witness did not mention any alleged crime, that the Government did not attempt to elicit any testimony regarding arrests, that the court promptly instructed the jury to disregard the answer, and that Kohlman's counsel had undoubtedly formulated his plan, shortly thereafter implemented, of using Kohlman's prior arrests to support his insanity defense, we conclude that the error was harmless beyond a reasonable doubt. Rule 52(a), F.R.Cr.P.

After the defense had elicited from its psychiatrists testimony that Kohlman's anti-social behavior and arrest record were consistent with a lack of capacity to appreciate the wrongfulness of his conduct, the prosecutor sought to challenge their opinion by bringing out that while they would have expected Kohlman, following his consumption of alcohol on prior occasions, to have committed criminal acts, he had not in fact robbed any banks prior to the present charge. Toward this objective the prosecutor asked "Then, Doctor, you would have expected, I assume, that he has robbed quite a few banks in the course of his life?" An objection was properly sustained by the trial judge, since the jury might erroneously have inferred that Kohlman had indeed committed other robberies, proof of which would be reversible error. The proper approach in pursuing the subject, if it was to be pursued at all, would of course have been to establish at the outset that Kohlman had never before committed a bank robbery. Any prejudice, however, was promptly obviated by the prosecutor's statement in the jury's presence, "My point is he hasn't done it [committed other robberies]." Furthermore, curative instructions were given by the court and the jury was advised that the parties had stipulated that "The defendant Ronald Kohlman has never been convicted of a crime."

We have examined the other claims of error advanced by Kohlman and find them to be without merit. The prosecutor's statement in the course of his summation that Kohlman had "tried this trick before" was understood by defense counsel to refer to a Family Court charge. Furthermore, having declined a curative instruction, Kohlman is precluded from raising the point on this appeal.

United States v. Nasta, 398 F.2d 283, 285 (2d Cir. 1968).

 It was within the trial judge's discretion to permit the use of charts by Dr. Lynch to explain his expert opinion, United States v. Ellenbogen, 365 F.2d 982, 988 (2d Cir. 1966), cert. denied, 386 U.S. 923, 87 S.Ct. 892, 17 L.Ed.2d 795 (1967). United States v. Bernard, 287 F.2d 715, 722 (7th Cir.), cert. denied, 366 U.S. 961, 81 S.Ct. 1921, 6 L.Ed.2d 1253 (1961), and to allow him to refer to classifications by the American Psychiatric Association, which would be admissible under an exception to the hearsay rule. 6 Wigmore, Evidence § 1700, at 17 (3d ed. 1940). Nor is it contended that the charts were inaccurate. Upon review of the charts in the light of Dr. Lynch's testimony, we fail to find any appreciable prejudice. Accordingly the district court did not abuse its discretion in admitting them. Although Dr. Lynch saw reports of examining doctors at the Springfield Medical Center which had been made in connection with their examination of Kohlman pursuant to 18 U.S.C. § 4244, he disregarded them entirely in rendering his own report, which was based solely upon competent evidence. United States v. Driscoll, 399 F.2d 135 (2d Cir. 1968), is therefore inapplicable to the facts of this case. See United States v. Matos, 409 F.2d 1245, 1247 (2d Cir. 1969), cert. denied, 397 U.S. 927, 90 S.Ct. 934, 25 L.Ed.2d 107 (1970).

The Government's elicitation at trial, after another Government counsel had earlier advised that no statements of the defendant would be introduced, of testimony from a detective that Kohlman, upon being arrested, labelled the charge against him a "bummer" or "bum rap," was harmless error beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Indeed, the reference was exculpatory and not prejudicial. The statement of Watkins, the taxi driver, as to the location of the stolen money in the motel room where Kohlman was arrested, could not have been produced by the Government for use in the suppression hearing since it was received after that hearing had been concluded. Furthermore its value to Kohlman was so tenuous at best that it could hardly be classified as material favorable to the defendant under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The conduct of a criminal trial in which evidence is offered with respect to a defense of insanity poses a greater than average challenge to a trial judge and we believe that in this case Judge Curtin met the demands fairly and with an appreciation for controlling principles. We commend Kohlman's counsel, R. William Stephens, for his able and conscientious representation in this case.

The conviction is affirmed.