———————

No. 96-1438

———————

United States of America,                    *
                                             *
              Appellee,                       *
                                             *
       v.                                     *  Appeals from the United States
                                             *  District Court for the
Phillip Henry Stands, also                    *  District of South Dakota.
known as Phillip Henry                        *
Atkinson, also known as                       *
Phillip Henry Creek,                          *
                                             *
              Appellant.                       *

———————

No. 96-1439

———————

United States of America,                    *
                                             *
              Appellee,                       *
                                             *
       v.                                     *
                                             *
Waylon Eric Duran,                            *
                                             *
              Appellant.                       *

———————

No. 96-1494

———————

United States of America,                    *
                                             *
              Appellee,                       *
                                             *
       v.                                     *
                                             *
Miguel J. Duran,                              *
                                             *
              Appellant.                       *

———————

Submitted:  October 24, 1996

Filed:  January 28, 1997

———————

Before BOWMAN, HEANEY, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

BOWMAN, Circuit Judge.

Phillip Stands, Waylon Duran, and Miguel Duran were tried by jury and were convicted of various crimes related to the beating of Gary Torrez. The defendants appeal. Finding no reversible error, we affirm the judgments of the District Court.[1]

**I.**

The following summary of the facts reflects the evidence in the light most favorable to the jury's verdicts. On the evening of October 28, 1994, Phillip Stands and his wife, Candida Duran, attended several parties in Rosebud, South Dakota, on the Rosebud Indian Reservation. Phillip and Candida spent much of the evening in separate company, and Candida was discovered by a tribal police officer the next morning. Because she appeared to be injured, the officer drove her to a friend's home, where Phillip met her. In response to Phillip's questioning, Candida said that she had been beaten up by some women at a party the previous night. Later, Candida told Phillip that she had been beaten by someone named Gary, whom she had met at a party, and that this Gary had left her naked in a ditch overnight. Phillip, who noticed that Candida's clothing was torn and her underwear was missing, believed she had been raped as well as beaten. Candida described Gary's appearance and told Phillip that she believed he was the son of Shorty Jordan, Phillip's uncle.

Waylon Duran, Miguel Duran (both Candida's brothers), and Dale Stands (Candida's cousin) stopped by Phillip's residence in Horse

_____

[1]The Honorable Charles B. Kornmann, United States District Judge for the District of South Dakota.

-2-

Creek, on the reservation, later on the morning of October 29. (Because of their common surnames, we will hereinafter refer to Phillip Stands, Candida Duran, Waylon Duran, Miguel Duran, and Dale Stands by their first names.) Phillip put a knife in his pants and announced that he was going to "stop" whoever had harmed Candida. Phillip, Waylon, Miguel, and Dale drove in Phillip's car to Rosebud to determine who had beaten Candida. After discovering that Shorty Jordan was not at home, they proceeded to Phillip's mother's home. She did not know who Gary might be. Phillip's mother later told an investigator that Waylon was talking about getting even with whoever attacked Candida, and she testified that Dale suggested that he could kill the attacker and get rid of the evidence. Silas Lincoln arrived later and suggested that the as-yet-unidentified Gary could be Gary Torrez, who matched Candida's description and was a son of Shorty Jordan.

Phillip, Waylon, Miguel, Dale, and Lincoln then went to look for Torrez, whom they found at his mother's home in Rosebud. Phillip introduced himself as Torrez's second cousin and asked if Torrez could help him find Shorty Jordan. When they discovered that Jordan was still not at home, the group of six went to Ghost Hawk Park, on the reservation, and drank beer and whiskey for about thirty minutes. They then returned to Rosebud and dropped off Lincoln. Torrez requested a ride home, but Phillip suggested that they pawn some rings, drive to White River, and buy more alcohol. Torrez agreed, and Phillip drove to his house to get the rings. While the car was parked behind the house, Miguel asked Torrez to get out of the car. At the same time, Phillip, inside the house, asked Candida if she could identify Torrez as the man who assaulted her. She told Phillip that Torrez was the right man.

Phillip drove north to White River, which is in Mellette County, off the reservation. He pawned his rings and bought beer, whiskey, and gasoline. He then suggested to Torrez that they go to see some Stands-Jordan family lands, and Torrez agreed. They drove

-3-

north from White River and eventually stopped in an isolated area near the west bank of the Little White River, where they continued to drink and socialize. After a while, Miguel opened the trunk of the car, took out a handful of clubs, bats, and other weapons, and handed them to Torrez, evidently in an attempt to ensure a fair fight. Phillip told Miguel to put the items away, which he did. Waylon asked Torrez if he could borrow his pull-over windbreaker. As Torrez was facing Waylon, Phillip hit Torrez in the back of the head with a shovel handle with sufficient force to break the handle. After Torrez fell to the ground, Phillip accused him of beating Candida the night before, which Torrez denied. Phillip, Waylon, and perhaps Dale hit and kicked Torrez numerous times. Miguel did not have any physical contact with Torrez, but Torrez testified that Miguel was standing behind the others "talking about hitting, kick him." Tr. at 193. Eventually, Miguel told the others not to hit Torrez any more, and they ceased.

Waylon then removed Torrez's clothing, except for his socks, and said that he could walk back to town naked, making a reference to Candida's being left naked the night before. Phillip and Waylon gathered the clothing and the weapons and placed them in the trunk. Miguel retrieved some of the clothes and gave them back to Torrez. With his knife, Phillip cut off a portion of Torrez's hair, letting out a war whoop and leaving a three-inch laceration on Torrez's scalp. Phillip, Waylon, Miguel, and Dale drove away, leaving Torrez unconscious and bleeding.

Approximately ten miles from the assault site, Waylon threw the remainder of Torrez's clothing and several weapons out of the car. Phillip drove back to his house, where a birthday party for a young relative was underway. Various guests at the party testified that all three defendants had blood on their clothes, Miguel and Waylon had blood on their hands, and Miguel carried a clump of hair.

The next morning, Torrez managed to walk several miles to the highway, where the sheriff found him and took him to the hospital. His forearm and the bone around his eye socket were fractured, and there was a large cut to his shin, in addition to the scalp laceration.

## II.

Phillip, Waylon, Miguel, and Dale were indicted on charges of kidnapping, in violation of 18 U.S.C. § 1201(a)(2) (1994) (Count I); assault with a dangerous weapon, in violation of 18 U.S.C. § 113(a)(3) (1994) (Count II); and assault resulting in serious bodily injury, in violation of 18 U.S.C. § 113(a)(6) (1994) (Count III). Dale pleaded guilty to misprision of felony and testified against the other defendants. The jury found Phillip guilty on all three counts, and the court sentenced him to 135 months in prison. The jury found Waylon not guilty of kidnapping but guilty on Counts II and III, and the court sentenced him to 74 months in prison. The court granted Miguel a judgment of acquittal on the kidnapping charge at the close of the government's case; the jury found him not guilty on Count II but guilty on Count III. The court sentenced him to five years' probation and a fine of $5000. After the court denied their post-trial motions, see United States v. Atkinson, 916 F. Supp. 959 (D.S.D. 1996), all three defendants appealed their convictions.

## III.

We begin with the most significant and difficult issue, whether federal jurisdiction was properly established. This issue involves two related inquiries: whether the government presented sufficient evidence to identify the site of the assault, and whether that site is within "Indian country," as defined by 18 U.S.C. § 1151 (1994). Along the way, we will consider Miguel's argument that the jury instruction defining Indian country was

-5-

erroneous and the contention of all three defendants that the indictment insufficiently identified the location of the assault.

**A.**

The defendants argue that the evidence is insufficient to establish the site of the assault.

> When reviewing the sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict rendered; we accept all reasonable inferences which tend to support the jury verdict; and while the evidence need not preclude every outcome other than guilt, we consider whether it would be sufficient to convince a reasonable jury beyond a reasonable doubt. We can reverse for insufficient evidence only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt.

United States v. Roach, 28 F.3d 729, 736 (8th Cir. 1994) (citations omitted).

At trial, the parties disputed whether the assault occurred in section 15 or section 22 of township 43 north, range 28 west in Mellette County. Each section is one mile square, and section 15 is immediately north of section 22, so we are concerned with a relatively small area. At trial, the government argued that the assault took place in section 22, which the government argues is within Indian country, while Phillip's testimony placed the assault in section 15, which the government concedes is not Indian country. We believe the evidence was sufficient for the jury to conclude that the assault took place in section 22.

After discovering Torrez on October 30, Sheriff Cecil Brandis, accompanied by two tribal police officers, set out to find the site of the assault. After some investigation on the east side of the Little White River, they crossed to the west side and turned south on an unpaved road. They were met by John Boyles, a woodcutter who

had seen the defendants and Torrez in the area the previous day and had heard police transmissions on his radio scanner. Boyles led the officers south to the spot where he had seen the defendants. Sheriff Brandis testified that they passed through one closed gate, and he believed they passed through another gate that was already open. Boyles and tribal officer Kelly Iyotte also testified that they went through two gates to reach the site, and Torrez testified that Phillip drove through two gates before the assault.[2] Within about 100 feet from the spot where Boyles directed them, the officers discovered beer cans, some of Torrez's clothing, a broken shovel handle, and what appeared to be blood.

Tribal investigator Grace Her Many Horses joined the officers at the site later in the evening of October 30. She returned the next day, along with tribal officer Christian Barrera, who had been at the scene on October 30, and Larry Marshall of Tribal Land Enterprises, an entity of the Rosebud Sioux Tribe. Despite cross-examination by counsel for all three defendants, both Her Many Horses and Barrera testified that they were certain that they returned to the same location where they had been the previous day. Marshall testified and demonstrated on two different exhibits that the site was in the northern portion of section 22.

Finally, Sheriff Brandis, tribal officer Iyotte, tribal officer Barrera, realty official Marshall, and FBI agent Drew McConaghy all identified a similar location on different aerial photographs of the area. See Ex. 24-26, 29, 41A. Judging from a signature S-curve in the river and a change in color on the ground, which could indicate a change in ownership at the section line, the

---

[2]Another tribal officer and Phillip both testified that they passed through only one gate. Nevertheless, the jury reasonably could have credited those witnesses who testified that the site was two gates removed from the main road. Although the parties do not state so explicitly, we assume that the significance of the second gate is that it is on the boundary line between sections 15 and 22.

jury reasonably could have found that the assault took place on section 22 rather than section 15.

## B.

Having determined that the government's evidence is sufficient to sustain its theory as to the location of the assault, we next consider the defendants' argument that the evidence is insufficient to show that that location is within Indian country. Kidnapping, assault with a dangerous weapon, and assault resulting in serious bodily injury are federal offenses when committed by an Indian in Indian country. See 18 U.S.C. § 1153(a) (1994). The defendants stipulated that they are Indians, and that issue is not before us. Indian country is defined as

> (a) all land within the limits of any Indian reservation . . ., (b) all dependent Indian communities . . ., and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151 (1994).

Jurisdiction over the kidnapping charge presents a relatively simple issue. It is clear from the evidence that much of the defendants' inveigling of Torrez--described more fully in section V-A of this opinion-- took place within the present-day boundaries of the Rosebud Reservation. The jury was instructed that Indian country includes, inter alia, land within the limits of any Indian reservation, as provided in § 1151(a). We thus are satisfied that jurisdiction over the kidnapping charge was adequately shown.

Whether the government established jurisdiction over the assault charges is a considerably more complicated question. All of Mellette County, where the assault occurred, has been outside the limits of the Rosebud Reservation since 1910. See Rosebud

Sioux Tribe v. Kneip, 430 U.S. 584, 609-15 (1977).  The government does not argue that the site of the assault is within a dependent Indian community.  Accordingly, federal jurisdiction over the assault charges is proper only if the parcel on which the assault occurred is an Indian allotment, the Indian title to which has not been extinguished.

Before turning directly to the merits of the sufficiency-of-the-evidence question, we first clarify some of the terminology used in § 1151 and in the trial below.

> Today, allotment is a term of art in Indian law, describing either a parcel of land owned by the United States in trust for an Indian ("trust" allotment), or owned by an Indian subject to a restriction on alienation in favor of the United States or its officials ("restricted fee" allotment).

Felix S. Cohen's Handbook of Federal Indian Law 615-16 (Rennard Strickland ed., 1982 ed.).  Nothing in this case turns on the distinction between the two types of allotments, although references in the record to "trust" land have created considerable confusion, as we shall see.  Many allotments arose out of the government's policy in the late nineteenth and early twentieth centuries, pursuant to the General Allotment Act, of breaking up Indian reservations into parcels to be held in trust by the United States for individual Indians.  See 25 U.S.C. §§ 331-334, 348-349 (1994); Solem v. Bartlett, 465 U.S. 463, 466-67 (1984).  When Congress later diminished a reservation, as it did with the Rosebud reservation, see Rosebud Sioux, 430 U.S. at 609-15, allotted lands outside the new reservation boundaries retained their allotment status, and they remain Indian country today unless their Indian titles have been extinguished.  See 18 U.S.C. § 1151(c) (1994); Rosebud Sioux, 430 U.S. at 615 n.48; Solem, 465 U.S. at 467 n.8.  "Fee land" refers to property owned or patented in fee simple, without the type of restrictions on alienation found in a

restricted fee allotment.  Fee land is therefore not allotted land, and fee land beyond the boundaries of a reservation is not Indian country.  "Tribal trust land" is land owned by the United States in trust for an Indian tribe.  The Secretary of the Interior is authorized to purchase land in trust for Indian tribes pursuant to the Indian Reorganization Act, see 25 U.S.C. § 465 (1994), and has purchased off-reservation land in trust for tribes on a number of occasions.  See, e.g., South Dakota v. United States Dep't of Interior, 69 F.3d 878, 880 (8th Cir. 1995) (holding § 465 unconstitutional), vacated, 117 S. Ct. 286 (1996).  For jurisdictional purposes, tribal trust land beyond the boundaries of a reservation is ordinarily not Indian country.[3]  A final category suggested by some of the evidence in this case is land owned by a tribe in fee.[4]  Whether property of this type is considered fee land or "tribal" land, it is not allotted land, and so if it is outside the reservation, it is not Indian country.

We now turn to the sufficiency of the evidence to establish that the assault occurred on allotted land, an issue we have considered only once before.  In United States v. Jewett, 438 F.2d 495 (8th Cir.), cert. denied, 402 U.S. 947 (1971), it was apparently undisputed that the land on which the crime occurred had been allotted to an individual Indian.  See id. at 497.  To demonstrate that the Indian title had not been extinguished, the government presented testimony from an official of the Bureau of Indian Affairs (BIA).  See id.  He testified that records of

---

[3]In some circumstances, off-reservation tribal trust land may be considered Indian country.  See, e.g., United States v. Azure, 801 F.2d 336, 338-39 (8th Cir. 1986) (tribal trust land could be considered de facto reservation or dependent Indian community). The government has not argued that Azure or similar cases apply here.

[4]Even land owned by a tribe in fee is subject to certain restrictions on alienation in favor of the United States.  See 25 U.S.C. § 177 (1994); Alonzo v. United States, 249 F.2d 189, 196 (10th Cir. 1957), cert. denied, 355 U.S. 940 (1958).

transfers of allotments were kept in his office, that each allotment was assigned a tract number, that the card corresponding to the tract on which the crime occurred revealed a number of transfers to Indians through inheritance, and that the final entry indicated that the allottee had transferred the property to the United States in trust for the tribe. See id. The government introduced into evidence a certified copy of the deed to the United States. See id. The witness testified further that a records search revealed no subsequent transfers, that he had verified with the BIA's principal office that the land was still held in trust for the tribe, and that the Indian title to the property had therefore not been extinguished.[5] See id. We concluded that "[s]ubstantial evidentiary support exists for the court's determination that the crime occurred in Indian country and hence jurisdiction is established." Id. at 498.

In the instant case, the government presented a far less coherent picture of the jurisdictional status of section 22. Insofar as we have been able to determine, in the course of the four-day trial only three references were made to allotments, and in none of them did a witness identify the assault site as an allotment. See Tr. at 134 (Boyles); id. at 314 (Marshall); Closing Arg. Tr. at 13. Other government witnesses identified the site as "tribal property," Tr. at 25 (Brandis), "tribal land," id. at 317 (Marshall), "tribal trust land," id. at 319 (Marshall), and "Indian trust land," id. at 533-34 (McConaghy). Although we might interpret Agent McConaghy's phrase "Indian trust land" as a reference to a trust allotment, the jury did not receive an instruction that would have enabled it to conclude that "Indian

---

[5]This represents another situation in which tribal trust land may be considered Indian country: if an allotment is transferred to the United States in trust for a tribe and becomes tribal trust land, it is still an allotment "the Indian title[] to which [has] not been extinguished." 18 U.S.C. § 1151(c) (1994). No one suggests that this possibility is relevant to this case.

trust land" might signify an allotment, and so the testimony is not helpful to the government's claim that the evidence on this issue was sufficient.

The government's confusion throughout the trial about the jurisdictional question is best exemplified in the following exchange between the Assistant U.S. Attorney and Larry Marshall, the tribal realty official:

Q.    Based on your education and experience, is the spot where Grace [Her Many Horses] and Officer Chris Barrera took you, is that tribal trust land?

A.    Yes.

. . .

Q.    And [are] there many areas of land that is tribal trust land in Mellette County?

A.    Yes.

Q.    Administered by your office?

A.    Yes.

Q.    And is that Indian country as you understand the term, based on your experience and your education?

A.    It's not considered Indian country, no.

Q.    It's not considered Indian country; it's tribal land?

A.    No.  We just have tribal land within Mellette County.

Q.    And you're not--I went too far. . . .

. . .

Q.    You don't have a law degree, do you?

A.    No.

Q.    Do you know the definition of Indian country for federal criminal prosecution?

A.    No.

Tr. at 319-21.  In sum, the government adduced no testimonial evidence from which the jury could conclude that the assault took place on an allotment.

The government did, however, introduce an exhibit from which the jury reasonably could have determined that jurisdiction was proper.  While Marshall was testifying, he referred to Exhibit 41B, which was admitted into evidence over the relevance-based objection of Phillip's counsel. None of the defendants objected to the authenticity or accuracy of the exhibit.  Exhibit 41B is a copy of a page from a Mellette County atlas, used in Marshall's office, showing land ownership in the township involved in this case.  All parties agree that the southern half of section 15--the spot where Phillip's testimony placed the assault--is owned by Eugene Strain (apparently in fee, as the government does not claim that the court would have had jurisdiction if the assault occurred there).  Most of the northern half of section 22, and in particular the northeast quarter of the section--where the government claims the assault occurred--is marked on Exhibit 41B with the notation "Allot 1553."  Other parcels are marked as "Allot," as "Tribal," as "Tribal I.R.A." (presumably for "Indian Reorganization Act"), or with the names of individual owners.  Several parcels also contain handwritten modifications, including reference numbers and subdivisions, and in one parcel, "Allot 3093" is stricken out.

The government argues that the notation "Allot 1553" is sufficient evidence to establish that the land at issue in this case is an allotment. We agree.  Although the government's arguments were presented poorly, the jury was instructed clearly that an allotment was one of the possible bases of Indian-country jurisdiction.  With Exhibit 41B before it during its deliberations, the jury reasonably could have found that the language "Allot 1553"

on the map, which was provided by a tribal officer, established that the parcel was an allotment.

This is only half of the story, however, because the government also needed to prove that the Indian title to the allotment had not been extinguished. See 18 U.S.C. § 1151(c) (1994). The government argues as follows: "The fact that Exhibit [41B] describes the assault site as located on Indian Allotment #1553 establishes that the Indian title has never been transferred or extinguished. If it had it would no longer be an Indian allotment." Br. of Appellee at 15. We are not overwhelmed by this argument. That the map shows the parcel as "Allot 1553" tends to establish only that it was an allotment when the map was originally published (a date that is not in the record). Since that time, the Secretary of the Interior could have issued the allottee a patent in fee, see 25 U.S.C. § 349 (1994), or the period of trust on the allotment could have expired, see 25 U.S.C. §§ 348-349 (1994),[6] or the allotment could have been inherited by a non-Indian, see 25 C.F.R. § 152.6 (1996), among other possibilities.

The complexity involved in this inquiry undoubtedly explains why the prosecutor in Jewett put a BIA official on the stand to describe what was essentially a title search of the property. Had the government presented this sort of evidence in the instant case, we would have a much easier question to decide. But despite the government's lackluster showing on this essential jurisdictional predicate of its case, we conclude that the jury verdict should be upheld. We believe the jury reasonably could have found that the map is up-to-date and that, if the Indian title to the relevant parcel had been extinguished, the map would have reflected the change. As we noted above, in another plot in the same township, the designation "Allot 3093" is stricken by hand, and the map shows

_____

[6]But see 25 U.S.C. §§ 462, 478-1 (1994) (extending periods of trust and restrictions indefinitely).

-14-

other handwritten changes.  In the absence of an objection to the authenticity or accuracy of Exhibit 41B, the jury thus was entitled to infer that the map accurately represented the state of title at the time of the crime.  Accordingly, the jury had a reasonable basis for finding that the crime occurred in Indian country.

## C.

Miguel raises a related issue regarding the jury instruction on Indian country, which quotes the operative provisions of § 1151 verbatim.  See Atkinson, 916 F. Supp. at 960-61.  Miguel argues that because the testimony involved descriptions of the land as various forms of "trust land," and because the instruction does not specify the Indian-country status of "trust land," the instruction does not adequately set forth the law.

None of the defendants objected to the instruction or proposed an alternative instruction.  As a result, our review is for plain error.  See United States v. Ryan, 41 F.3d 361, 366 (8th Cir. 1994) (en banc), cert. denied, 115 S. Ct. 1793 (1995).  We see no plain error in the instruction, which sets forth the law as clearly as the United States Code does.  The instruction "clearly and properly explained to the jury the legal principles governing the case."  Feingold v. United States, 49 F.3d 437, 439 (8th Cir. 1995).  In any event, as we have explained above, the various discussions in trial testimony of "trust land" were essentially irrelevant to the question at hand, and a more detailed explanation of Indian country jurisdictional principles might only have confused the jurors.

## D.

In another related issue, all three defendants challenge the sufficiency of the indictment.  In particular, they argue that the indictment failed fairly to apprise them of the location of the alleged crimes.  The indictment alleges that each count occurred

"approximately 7.6 miles north of White River and 1.3 miles east of Highway 83 in Mellette County, in Indian country, in the District of South Dakota." Superseding Indictment at 1-2. The defendants do not challenge the north-south accuracy of the indictment, but they do argue that the site of the assault, the northeast corner of section 22, is about 3.5 miles east of Highway 83. This argument is potentially significant because much of the property east of Highway 83 and west of section 22 is fee land, and thus not Indian country.

An indictment is sufficient if it (1) contains the elements of the charged offense and fairly informs the defendant of the charge against which he or she must defend and (2) enables him or her to plead double jeopardy as a bar to further prosecution. See United States v. Just, 74 F.3d 902, 903-04 (8th Cir. 1996). An indictment that is challenged after jeopardy has attached is liberally construed in favor of sufficiency. See id. at 904. Unless the indictment is so defective that by no reasonable construction can it be said to charge the offense for which the defendants were convicted, we will uphold it. See id.

In the circumstances of this case, the defendants' challenge to the indictment fails. The indictment specifically states that its geographical measurements are approximate. Agent McConaghy testified that he obtained the measurements by driving north from White River on Highway 83 for 11.3 miles, driving east for 1.3 miles, and driving south for 3.7 miles. See Tr. at 575-77. Because the roads in the area do not correspond precisely to compass points, the site of the assault is not exactly 7.6 miles north of White River and 1.3 miles east of Highway 83. Nevertheless, the geography of the indictment is reasonably accurate, and it is clear from the testimony that the defendants were well aware of the charges against them. In addition, the defendants' evidence placed the incident even further east than the government's evidence did. Compare id. at 711 (Phillip's testimony

that incident occurred 25 or 30 yards from river) with id. at 559 (McConaghy's testimony that site was 1/4 mile from river). Nothing in the record suggests that the defendants were in any way misled by the indictment's slight east-west imprecision, and no one suggests that the defendants would have any difficulty pleading double jeopardy to bar another prosecution for the kidnapping and assault of Torrez. We conclude that the indictment was sufficient.

## IV.

At this point, we consider a somewhat collateral issue raised by Phillip. In the statement of the issues in his opening brief, Phillip suggests that the court should have determined the jurisdictional question as a matter of law. Unfortunately, Phillip does not pursue this issue in the text of his brief or cite any authority for the proposition. Based on our own research, we are inclined to think that his suggestion is partially correct: given a particular piece of land, it is for the court, not the jury, to determine whether that land is in Indian country. See United States v. Deon, 656 F.2d 354, 356-57 (8th Cir. 1981) (court may determine as a matter of law that area is in Indian country); United States v. Cook, 922 F.2d 1026, 1031-32 (2d Cir.) (determination of whether site of offense is in Indian country is for court alone), cert. denied, 500 U.S. 941 (1991); United States v. Sohappy, 770 F.2d 816, 822 n.6 (9th Cir. 1985) (what constitutes Indian country is matter for judge, not jury), cert. denied, 477 U.S. 906 (1986); United States v. Levesque, 681 F.2d 75, 78-79 (1st Cir.) (error to submit question to jury) (dictum), cert. denied, 459 U.S. 1089 (1982).[7] This question, which we considered in

---

[7]In other factual situations, courts have held that the existence of jurisdiction over crimes committed in a particular geographic area is a question for the court. See, e.g., United States v. Hernandez-Fundora, 58 F.3d 802, 809-10 (2d Cir.) (federal prison), cert. denied, 115 S. Ct. 2288 (1995); United States v. Warren, 984 F.2d 325, 327 (9th Cir. 1993) (military base).

section III-B, is analytically distinct from the issue we reviewed in section III-A: whether the crime in fact occurred on a particular piece of land or within a particular area. The latter question--the location of the crime--is certainly a factual issue for the jury. See United States v. Eder, 836 F.2d 1145, 1147-48 (8th Cir. 1988) (jury had to find that killing occurred on reservation); United States v. Warren, 984 F.2d 325, 327 (9th Cir. 1993) (locus of offense is an issue for trier of fact).

In the case at bar, it may have been error for the District Court to submit to the jury the narrow question of whether the alleged site of the offense was Indian country. Nevertheless, the defendants did not object to the submission, so the issue has been waived, and we cannot say that the asserted error so affected the defendants' substantial rights as to warrant reversal under the plain error standard of review. Thus we do not consider the issue further.

**V.**

Phillip and Miguel also challenge the sufficiency of the evidence to support their convictions.

**A.**

Phillip argues that the evidence is insufficient to support his conviction for kidnapping Torrez. As relevant here, the federal kidnapping statute applies to any person who "unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person." 18 U.S.C. § 1201(a) (1994). The government acknowledges that no forceful abduction took place and that Phillip sought no ransom, but argues that the conviction is supportable under the phrases "inveigles, decoys" and "otherwise." We agree.

-18-

Viewed in the light most favorable to the verdict, the evidence reveals that Phillip encouraged Torrez to get into and remain in the car when he might otherwise have wished to go his own way.  The jury reasonably could have concluded that Phillip intentionally sought to gain Torrez's trust by introducing himself as a cousin, asking to see Shorty Jordan, drinking with Torrez for a while, suggesting the trip to White River to get more alcohol, and offering to show Torrez some family land, while Phillip was also planning to conduct an informal one-man lineup and to take Torrez to an isolated location where the assault was not likely to be interrupted.  We believe the evidence is more than sufficient to support the government's contention that Phillip inveigled or decoyed Torrez into joining the group.  That Torrez agreed to accompany the others is not dispositive, because he "did not consent 'to the kind of trip eventually undertaken.'"  United States v. Eagle Thunder, 893 F.2d 950, 952 (8th Cir. 1990) (quoting United States v. Wesson, 779 F.2d 1443, 1444 (9th Cir. 1986)); see also United States v. Hoog, 504 F.2d 45, 50-51 (8th Cir. 1974) (inducing victim to accept ride and remain in vehicle under false pretenses constitutes inveigling or decoying), cert. denied, 420 U.S. 961 (1975).

We interpret the "or otherwise" language in the kidnapping statute broadly.  See United States v. Bordeaux, 84 F.3d 1544, 1548 (8th Cir. 1996).  A conviction is proper if the victim was taken "for some reason that the defendant considered of sufficient benefit to him, or for 'some purpose of his own.'"  Id. (citation omitted).  The jury reasonably could have determined that Phillip's reasons for inveigling Torrez into accompanying him were to have Candida identify Torrez, and then to assault Torrez in an isolated location where detection would be unlikely.  Some evidence also suggests that Phillip thought he could avoid federal prosecution by taking Torrez off the reservation for purposes of the assault.  These reasons are clearly sufficient to support the kidnapping

conviction.  See id. (affirming conviction of kidnapping for purposes of assault and proceeding to isolated location).

## B.

Miguel also challenges the sufficiency of the evidence to support his conviction.  As we noted above, Miguel was convicted only of assault resulting in serious bodily injury, and the government seeks to uphold his conviction only on the theory that he aided and abetted the others' assault of Torrez, a theory that was properly charged and presented to the jury. Although Miguel did not himself beat Torrez, we conclude that the jury reasonably could have found that Miguel aided and abetted the assault.

One who "aids, abets, counsels, commands, induces or procures" a crime is punishable as a principal.  18 U.S.C. § 2 (1994).  We have recognized that aiding and abetting is not itself a crime; rather, § 2 imputes the actions of the principal to the aider and abettor as a matter of law.  See United States v. Simpson, 979 F.2d 1282, 1285 (8th Cir. 1992), cert. denied, 507 U.S. 843 (1993).  Liability for the actions of a principal requires only "that the defendant was associated with the unlawful venture, participated in it as something the defendant wished to bring about, and sought by the defendant's own action to make it succeed." United States v. Dunlap, 28 F.3d 823, 826 (8th Cir. 1994).

The jury reasonably could have found that Miguel was, at the very least, aware of the nature and purpose of the group's search for Torrez and that, at times, he was an active participant in the day's activities. Miguel asked Torrez to get out of the car during the one-man lineup and encouraged the others to hit and kick Torrez during the beating.  When he returned to the reservation, Miguel had blood on his hands, shoes, and clothing, and one witness stated that he was carrying hair.  We recognize that Miguel sought to protect Torrez from further injury by providing Torrez with means

-20-

to defend himself, telling the others to stop the beating, and returning some clothing to Torrez. The District Court properly considered these factors, among others, in imposing a sentence well below the applicable guidelines range of 33 to 41 months in prison, but they do not vitiate Miguel's participation as an aider and abettor of the assault.

**VI.**

Finally, we consider the defendants' allegations of prosecutorial misconduct. "The test for reversible prosecutorial misconduct has two parts: (1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." United States v. Hernandez, 779 F.2d 456, 458 (8th Cir. 1985). Defense counsel did not object to most of the prosecutorial statements which are now urged to be improper; we review these statements for plain error, reversing only if the error is clear, affects the defendant's substantial rights, and seriously affects the fairness, integrity, or public reputation of judicial proceedings. See United States v. Olano, 507 U.S. 725, 734-37 (1993); United States v. Grady, 997 F.2d 421, 424 (8th Cir.), cert. denied, 510 U.S. 958 (1993).

We begin with two questions acknowledged by the government to be improper. Candida testified that she did not tell the tribal police officer who discovered her what had happened to her because she was "still in shock." Tr. at 620. The prosecutor replied, "When did your memory suddenly come back to you?" Id. Later, Candida testified that the tribal officer "said either Phillip could take me home or he was going to take me to jail." Id. at 623. The prosecutor countered, "And so you took the lesser of those two evils. You went with Phillip[,] right?" Id. Defense counsel objected to both questions; the first was rephrased properly, and the court cautioned the jury to disregard the second.

We agree that these questions were improper, particularly the second. But the marginal effect of these comments on a collateral issue--whether Candida was in fact raped--in the context of a four-day trial, the substantial evidence of the defendants' guilt, and the curative actions of the court convince us that this misconduct was not so significant that it deprived the defendants of a fair trial. See Hernandez, 779 F.2d at 460-61.

When Phillip was on the stand, the prosecutor suggested on cross-examination that Phillip had changed the order of several events he had related during direct examination. See Tr. at 799-800. Counsel did not object, and Phillip insisted that his direct testimony was not as the prosecutor had characterized it. The prosecutor said nothing further about the issue. A review of the sometimes confusing direct testimony suggests that Phillip was correct and his testimony was consistent. Although the prosecutor was incorrect, we believe his questioning was the result of an honest mistake rather than any impropriety, and its effect on the proceedings was minimal.

In another portion of Phillip's testimony, the government attempted to explore Phillip's previous robbery conviction. The prosecutor asked whether Phillip had "received a sentence," id. at 823; counsel objected, and the court sustained the objection. The prosecutor then sought to clarify Phillip's direct testimony that he had "been convicted of no felonies since then," id. at 673, by eliciting a concession that one reason Phillip had been convicted of no felonies was that he was still in prison on the robbery conviction. In other words, the prosecutor attempted to counter the impression left by Phillip's direct testimony that he had been a law-abiding citizen since the robbery conviction. In a bench conference, the court determined that defense counsel had opened the door to the government's line of questioning, but that the questions would be more prejudicial than probative. We need not determine whether this ruling was correct, because the only issue

before us is whether the questions that were actually asked denied the defendants a fair trial. On this issue, the jury heard the unsurprising information that Phillip had received a sentence for his robbery conviction; otherwise, the prosecutor got no farther than "But it's--" before he was cut off and the questioning was ruled inadmissible. Id. at 823. We conclude that the defendants were in no way prejudiced by these questions.

Phillip's sister testified in an attempt to show that Torrez did not believe he had been kidnapped. The following exchange took place during cross-examination:

> Q. You don't recall mentioning to Gary Torrez that your brother had offered $1,000 if he'd keep his mouth shut?
>
> A. No.
>
> Q. Did your brother ever communicate that fact to you?
>
> A. Not for $1,000.

Id. at 661. The discussion continued, but defense counsel's only objection was that questions about the alleged bribe had been asked and answered. On appeal, the defendants contend that this line of questioning constituted an unfounded attack on the character of both the witness and Phillip. The government insists that it had a factual basis for asking these questions, but when the witness denied that the incident had occurred, the government decided not to explore this collateral issue further. We have no means of determining whether or not the government had a factual basis for this line of questioning, but in any event, we are unable to conclude that the questions so undermined the fairness of the proceedings as to constitute reversible error under the plain error standard of review.

Near the end of the trial, the court asked defense counsel if they had any surrebuttal witnesses. When counsel answered

affirmatively and asked for a few minutes "to make sure they're here," the prosecutor responded, "Your Honor, I guess if they have witnesses, I'd ask they call them now rather than go out and talk to them beforehand." Id. at 877. The government now claims that the prosecutor meant to suggest that the trial proceed without a recess so that members of the audience would not report the developments in rebuttal testimony to the surrebuttal witnesses. If that was in fact the prosecutor's intent, he phrased his statement in such a fashion that it unfairly impugned the integrity of defense counsel. Nevertheless, no one objected to the statement, and after a short break, counsel was able to ease the sting of the statement by asking the next witness, "Did I go out there and talk to you and tell you what to say?" Id. In light of the record as a whole, we reject the argument that, under the plain error standard, the prosecutor's improper statement warrants a reversal of the defendants' convictions.

We have reviewed carefully the defendants' other claims of prosecutorial misconduct and have concluded that they are meritless.

## VII.

Although we find nothing in Phillip's pro se supplemental brief that aids his appeal, we grant leave to file the brief. The convictions of the defendants are affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.